**MAG PORTFOLIO CONSULT, GMBH, Plaintiff–Appellee,**

v.

**MERLIN BIOMED GROUP LLC and Merlin Biomed Advisors LLC, Defendants–Appellants.**

**Docket No. 00–9502.**

United States Court of Appeals, Second Circuit.

Argued: June 29, 2001.

Decided: Oct. 10, 2001.

Barry G. Felder (Catherine M. McGrath and Jennifer L. Gray (on the brief)) Brown Raysman Millstein Felder & Steiner LLP, New York, NY, for Defendants–Appellants.

Philip Raible, Mintz & Gold LLP, New York, NY, for Plaintiff–Appellee.

Before MINER, JACOBS, and POOLER, Circuit Judges.

POOLER, Circuit Judge:

Defendants–Appellants Merlin Biomed Group, LLC and Merlin Biomed Advisors, LLC appeal from an October 26, 2000, order of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *Judge*) compelling defendants to participate in arbitration proceedings ongoing between Plaintiff–Appellee MAG Portfolio Consult, GMBH (on the one hand) and (on the other hand) Merlin Biomed Asset Management, LLC, Merlin Biomed Advisors, LLC, Merlin Biomed Services, LLC and Dr. Stuart Weisbrod. Defendants appeal, arguing that there is no legal theory applicable to the facts of this case for compelling arbitration, that the district court mistakenly concluded that defendants were created for the purpose of evading the court's previous order compelling arbitration, and that an evidentiary hearing was required. Because we find that arbitration could not be compelled on the basis of an estoppel theory and that there was insufficient fact finding to support compelling arbitration on the basis of a veil-piercing theory, we vacate the district court's order and remand for an evidentiary hearing on the

question of whether the district court should pierce the corporate veil of the defendants in order to compel arbitration.

## BACKGROUND

In January 1998, Stuart Weisbrod and Michael Gotthelf, through Gotthelf's company, MAG Portfolio Consult, GMBH ("MAG"), formed Merlin Biomed Asset Management, LLC ("MBAM"), Merlin Biomed Advisors, LLC, and Merlin Biomed Services, LLC (collectively, "the old Merlins"). Weisbrod and MAG each had a 50% stake in each company forming the old Merlins. The old Merlins managed two investment funds focused mainly on health care securities. In 1999, Weisbrod and MAG decided to end their partnership, and on May 27, 1999, MAG and the old Merlins executed two agreements which had the effect of extinguishing MAG's interest in the old Merlins.

The first agreement was a Purchase and Sale Agreement which transferred MAG's stake in the old Merlins to MBAM in exchange for $26,000 and a guarantee of either $10,000 a year for five years starting in 2000 or 10% of the annual profits for each of the same years, whichever was greater. The agreement also specified that if any of the old Merlins attempted to transfer assets to other funds in which a member or officer of the old Merlins had an equity interest of 25% or more during the five years MAG was to receive a share of the profits, MAG was entitled to receive 10% of the profits earned from managing those transferred assets. Finally, the agreement specified that the parties would submit disputes arising under it to arbitration.

The second agreement made was a Marketing Agreement. Under that agreement, MAG was to make a good faith effort to ensure that a German company, Deutsche Vermogenbildungsgeselschaft mbH/Deutsche Gesellschaft fur Wertpapiersparen mbH, would invest in the funds managed by the old Merlins. In the end, the German company did not invest in the funds, and Weisbrod alleges that MAG breached this agreement. As a result of the loss of the assets of the German company, the old Merlins needed new business. Weisbrod "aggressively began to market the Merlin Funds" but found new investors reticent, he claims, because the old Merlins did not invest exclusively in health care funds, their area of expertise. Somehow, the solution to this problem required that the old Merlins resign from their duties as fund managers and that they be replaced by newly created entities, Merlin Biomed Group, LLC and Merlin Biomed Investment Advisors, LLC ("the new Merlins"). Weisbrod asserts he was the principal shareholder in all the old and new Merlins and thus had the right to effect the changes that he did. The effect of this transaction was that the old Merlins had substantially reduced profits.

On February 15, 2000, MAG commenced arbitration proceedings against MBAM for breach of the purchase agreement. On March 3, 2000, MBAM brought suit in the United States District Court for the Southern District of New York (Hellerstein, *J.*) alleging that MAG had, among other things, fraudulently induced MBAM to enter into the purchase and marketing agreements. The complaint also sought an order staying the arbitration proceedings. MAG cross-moved for an order compelling arbitration, which the district court granted. On May 9, 2000, MBAM informed MAG by letter that two of the old Merlins had resigned their management positions and accordingly "no longer earn any performance fees or management fees." On June 15, 2000, MAG petitioned the district court for an order compelling the new Merlins to join the arbitration proceeding

between MAG and MBAM. After a brief hearing, the district court granted MAG's petition apparently on the basis of either an estoppel theory or a veil-piercing theory. The district court noted there was no "independent commercial basis for resignation [of the old Merlins] and appointment [of the new Merlins]" by Weisbrod and concluded that "Merlin Biomed Group LLC and Merlin Biomed Investment Advisors LLC having succeeded to the rights and obligations of the managerial responsibilities for these funds are bound by the original agreement to arbitrate." The new Merlins appealed.

## DISCUSSION

■ We note, as an initial matter, that an appeal from an order to compel arbitration may be taken immediately where the suit to compel arbitration is " 'independent'—that is, if the plaintiff seeks an order compelling or prohibiting arbitration . . . and no party seeks any other relief." *CPR (USA) Inc. v. Spray*, 187 F.3d 245, 252 (2d Cir.1999); *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 984 F.2d 58, 60 (2d Cir. 1993); 9 U.S.C. § 16. Since the only issue between the parties in this suit is whether the new Merlins should be compelled to join the arbitration proceeding involving MAG and MBAM, the suit is independent, and we have jurisdiction. "[T]he determination that parties have contractually bound themselves to arbitrate disputes—a determination involving interpretation of state law—is a legal conclusion subject to our *de novo* review . . . but . . . the findings upon which that conclusion is based are factual and thus may not be overturned unless clearly erroneous." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 295 (2d Cir.1999).

There are five theories "for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995). Only the latter two theories are relevant here.

### A. Estoppel

■ Under the estoppel theory, a company "knowingly exploiting [an] agreement [with an arbitration clause can be] estopped from avoiding arbitration despite having never signed the agreement." *Id.* at 778. Guided by "[o]rdinary principles of contract and agency," we have concluded that where a company "knowingly accepted the benefits" of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir.1993) (internal quotation marks and citation omitted). The benefits must be direct—which is to say, flowing directly from the agreement. *Thomson–CSF*, 64 F.3d at 779. *Deloitte*, for example, concerned an agreement containing an arbitration clause which governed the terms of use of a trade name. A nonsignatory who had received a copy of the agreement, raised no objections to it and made use of that trade name pursuant to the agreement was estopped from arguing it was not bound by the arbitration clause in the agreement. *Deloitte*, 9 F.3d at 1064.

■ By contrast, the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself. *Thomson–CSF*, 64 F.3d at 778–79. In *Thomson–CSF*, for example, two companies agreed to trade exclusively with each other. *Id.* at 775. A third-party competitor acquired one of the companies, apparently with the intent of squeezing the

remaining company out of the market. *Id.* The unacquired signatory was contractually bound to trade only with a company that was now a subsidiary to its competitor. *Id.* Thus, interest in trading waned. *Id.* While the agreement was crucial to the benefit the third party gained by shutting its competitor out of the market, the agreement was not the direct source of the benefit. *Id.* at 778–79. Rather, the benefit flowed from the nonsignatory's exploitation of the contractual relation created through the agreement by acquiring one of the signatories to the agreement.

■ *Thomson–CSF* mentions an alternative estoppel theory applicable to arbitration clauses. Under this theory, a court will "estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," and the signatory and nonsignatory parties share a close relationship. *Id.* at 779. Thus, for example, "parties [may be] estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of [the nonsignatory] parties asserting the arbitration and not the parties themselves." *Id.* However, because arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party. *Id.*

■ Although the district court was not explicit about the legal theory on which it rested its holding, MAG did argue that the new Merlins could be bound on an estoppel theory. The district court asserted that "[t]he benefits of the bargain having been moved from the original signatories to the successors bind the successors to honor the agreement that was made to arbitrate

disputes," suggesting possible reliance upon the first estoppel theory. However, the district court followed up by stating its reliance on two estoppel cases, both of which rely on the second estoppel theory. *See Fluor Daniel Intercontinental, Inc. v. General Electric Co.,* 1999 WL 637236 (S.D.N.Y. Aug.20, 1999); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.,* 1998 WL 314767, 1998 U.S. Dist. Lexis 8678 (S.D.N.Y. June 15, 1998). The second theory is not applicable in a situation like the case before us, where the signatory to an arbitration clause seeks to enforce it against a nonsignatory. Thus, the only applicable estoppel theory here is the first one, requiring a direct benefit.

To prevail, then, MAG must show that the new Merlins "knowingly exploit[ed]" the purchase contract and thereby received a direct benefit from the contract. *Thomson–CSF,* 64 F.3d at 778. The purchase agreement secured for MBAM the benefit of MAG's interest in the old Merlins while securing for MAG the benefit of a percentage of the old Merlins' future profits for a limited period of time. MAG argues that the direct benefit to the new Merlins is the receipt of the percentage of profits that would be due to MAG had the new Merlins not supplanted the old Merlins. However, whatever appeal this argument has exists only if one proceeds on the assumption that the new Merlins are alter egos of both Weisbrod and the old Merlins. If another company successfully competes against and acquires business from the old Merlins, the most we can say about the bearing of an agreement distributing the old Merlins' profits upon the successful competitor is that it is irrelevant.

At oral argument MAG referred us to *Am. Bureau of Shipping v. Tencara Shipyard, S.P.A.,* 170 F.3d 349 (2d Cir.1999), claiming that this case indicates the direct benefit received can be much more tenu-

ous than *Thomson–CSF* suggests. However, we find nothing in the case that alters our analysis. In *Tencara*, owners were found to directly benefit from an agreement signed between a shipyard that had contracted with the owners to build a ship and a classification society where the agreement was for the purpose of securing the classification of the vessel being built for the owners. *See id.* at 351. In short, the agreement was made by one of the signatories for the purpose of completing business it had with the nonsigning owners, and the owners directly benefitted from it because getting the vessel classified enabled it to be insured by the owners at rates cheaper than would otherwise be available, and it enabled the vessel to fly under the flag of a country. *See id.* at 351, 353.

In this case, again assuming the old and new Merlins are not alter egos of each other or Weisbrod, there is no relationship between the signatories and the nonsignatory except that they are competitors for the same business. Even assuming a less than arms length relationship between the old and new Merlins, the most one could say is that the specific terms of the contractual relation between MAG and the old Merlins had been exploited by Weisbrod to the disadvantage of MAG. The benefit to Weisbrod would not flow, in such a case, from the agreement itself, but from his ability to evade the intent of the agreement through the creation of alter egos.

### B. Veil–Piercing

■ Under New York law, a court may pierce the corporate veil where 1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and 2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997). Determining that veil-piercing is appropriate is a "fact specific" inquiry, and courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir.1997).

■ During the hearing below, the district court's questions focused on the relation between the old Merlins and the new Merlins. While the Merlin attorney was evasive, what the district court could ascertain allowed it to conclude that there were "no facts to show independence ... no facts to show separate ownership .... no facts to show an independent commercial basis for resignation and appointment and all that appears is that this is another effort that you started before to avoid the clear intentment [sic] of the contract and arbitration."[1] Thus it appears that the

---

1. The new Merlins seize on this statement and argue it shows that the district court mistakenly found that the new Merlins were created for the purpose of evading arbitration, when, in fact, the new Merlins were created before the arbitration between MBAM and MAG had been ordered by the district court. However, the above quote—and the overall hearing record—do not support this contention. The district court stated that it suspected the new Merlins were a vehicle to allow MBAM to

court concluded that the new Merlins were dominated by Weisbrod and the old Merlins, thereby fulfilling the first prong of a corporate veil-piercing analysis. The district court also, arguably, found the second prong satisfied as well: the wrong here would be avoiding the "clear intentment [sic] of the contract."

The problem with affirming on this ground is that the hearing was very brief and involved precious little fact finding, while our case law teaches determining whether to pierce the corporate veil is a very fact specific inquiry involving a multitude of factors. *See Freeman*, 119 F.3d at 1053. Further, at the close of its hearing, the district court declared itself to be following cases where arbitration was compelled on the basis of an estoppel theory. On appeal we find the underlying grounds of the district court's decision ambiguous enough to be subject to real debate, making it difficult for us to say with assurance that the district court even intended to pierce the new Merlins' corporate veil. The most we can say, based on the brief hearing below, is that the district court considered both an estoppel and a veil-piercing theory, but did not adequately explore either. Instead, it rapidly concluded arbitration would be compelled based on the fact that something seemed obviously amiss in the substitution of the new Merlins for the old Merlins.

The district court did ascertain that there was no consideration involved in the new Merlins succeeding to the managing role of the old Merlins. *Id.* (listing as factor "whether the dealings between the entities are at arms length"). The district court also pressed the Merlins' attorney on the question of whether Weisbrod controlled both companies, asking whether "Weisbrod caused the resignation and Weisbrod caused the appointment?" *See*

*Freeman*, 119 F.3d at 1053 (listing as factor "the degree of discretion shown by the allegedly dominated corporation"). The Merlins attorney's response was evasive, arguing that limited partners were involved in the approval of the succession of Merlins, a claim the district court found fishy and rejected. However, given the number of factors a court might consider, we conclude that the district court's fact finding was too cursory. *See Freeman*, 119 F.3d at 1053 (listing as other factors: disregard of corporate formalities, inadequate capitalization, overlap in officers, shared office space, intermingling of corporate property, failure to treat the corporations as independent profit centers, and paying of one entity's debts by the other).

The fact finding with regard to the second prong of the veil-piercing analysis is even more cursory and contradicted by a later statement that Weisbrod's purpose in substituting one company for the other was irrelevant: "I won't go into the underlying motivation of the business to have or not to have different managers. That is Mr. Weisbrod's prerogative. The question is whether these additional parties are bound by the original deal and it seems to me they are." Without a finding that the domination occurred for the purpose of committing a wrong, the second element of a veil-piercing analysis has not been met. *See id.* at 1053 ("While complete domination of the corporation is the key to piercing the corporate veil, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required.") (internal quotations omitted).

Because we cannot affirm the district court based on an estoppel theory and because the record does not contain sufficient fact finding to support affirmation based on a veil-piercing theory, we remand to the district court for an evidentiary

---

evade its contractual obligations, one of which included arbitration of disputes.

hearing to determine whether compelling arbitration based on a veil-piercing theory is warranted.

## CONCLUSION

We find that the new Merlins have not directly benefitted from the purchase agreement between MAG and MBAM and therefore we cannot affirm the district court's order compelling arbitration on the basis of an estoppel theory. The record before us does not allow us to determine whether the district court intended to compel arbitration on the basis of a veil-piercing theory or whether a piercing of the corporate veil is justified on these facts. Accordingly, we vacate the district court's order and remand to the district court for an evidentiary hearing on the question of whether the corporate veil of the new Merlins should be pierced in order to compel arbitration.

Each party will bear its own costs.