■ In the Matter of SAMUEL BELZBERG, Respondent, et al., Petitioners, v VERUS INVESTMENTS HOLDINGS INC., Appellant. [945 NYS2d 67]—

Judgment and supplemental order, Supreme Court, New York County (Shirley Werner Kornriech, J.), entered August 9, 2011, which, to the extent appealed from as limited by the briefs,

granted the petition to permanently stay the arbitration as to petitioner Samuel Belzberg and denied the cross petition to compel Belzberg to arbitrate, unanimously reversed, on the facts and the law, without costs, the petition denied and the cross petition granted. The Clerk is directed to enter judgment accordingly.

In October 2008, petitioner-respondent Samuel Belzberg, an investor, and his friend Ajmal Khan, principal of respondent-appellant Verus Investments Holdings Inc. (Verus), decided to purchase securities in Fording Canadian Coal. Because the investment would require an American brokerage account, Belzberg, a Canadian citizen, asked Khan to process the trade through Verus's account at Jefferies & Company, Inc. (Jefferies). The brokerage account customer agreement between Jefferies and Verus contained an arbitration clause.

Several weeks later, Belzberg directed that $5 million for the investment be wired to the Jefferies account from a company called Winton Capital Holding (Winton); Verus itself wired $1 million of its own money. Winton is a British Virgin Islands corporation owned by a trust of which Belzberg's children are the sole beneficiaries. Belzberg organized Winton for the benefit of his children and provided the initial capital. According to Belzberg, he acts as Winton's financial advisor, but has no ownership or beneficial interest in the corporation.

In November 2008, the Fording securities were liquidated and the proceeds were distributed to Verus's brokerage account. The profits from the Fording investment attributable to the $5 million put up by Winton amounted to $223,655. At Belzberg's direction, Verus returned the $5 million principal investment to Winton. But, instead of having the profits sent to Winton, Belzberg directed Verus to wire those funds directly to petitioner Doris Lindbergh, Belzberg's good friend of 25 years. Verus complied with Belzberg's request and wired $223,655 to Lindbergh from its Jefferies account.

Soon thereafter, Canadian authorities notified Jefferies that a $928,053 withholding tax was owed on the distribution of the principal of the investment and the profit paid to Lindbergh. Khan asked Belzberg to pay, either personally or through one of his entities, the withholding tax attributable to the money put up by Winton, but Belzberg refused. In September 2009, Jefferies commenced an arbitration before the Financial Industry Regulatory Authority against Verus for the unpaid withholding taxes. Verus answered and asserted third-party arbitration claims against, inter alia, Belzberg, Lindbergh and Winton seeking payment for their share of the taxes.

In April 2010, Belzberg, Lindbergh and Winton filed an CPLR article 75 petition to permanently stay arbitration of the third-party claims. Petitioners asserted that since they were not customers of Jefferies, they were not subject to the arbitration agreement between Jefferies and Verus. Verus opposed the petition and moved to compel arbitration, arguing that petitioners should be estopped from avoiding arbitration because they knowingly received direct benefits from the Verus-Jefferies customer agreement. The motion court granted the petition to the extent of compelling Winton to arbitrate since it had received a direct benefit under the agreement. With respect to Lindbergh and Belzberg, the court ordered a hearing to determine whether they knowingly exploited the customer agreement and directly benefitted from it.

Belzberg was unable to come to New York for the hearing and instead was deposed in California. At that deposition, he testified that he is a financial advisor for Winton and has the authority to make investment decisions on Winton's behalf. He testified that he derived no financial benefit from the Fording trade, but acknowledged that, at his direction, the profits from the trade were sent, purportedly "through Winton," to Lindbergh. Belzberg characterized the money as a loan so that Lindbergh, who could not get a mortgage, could purchase a country home. Belzberg testified that the loan would be repaid "one of these days," and the repayment would go to Winton. Belzberg acknowledged there was no documentation for the loan.

Lindbergh, a lawyer who formerly worked in the financial industry, testified at the hearing that she was unemployed at the time and could not get a mortgage to buy a summer house. In November 2008, Belzberg called and said, "I'm sending you money" because he wanted to help her buy the home. Lindbergh was "surprise[d]" at Belzberg's generosity and told him that she was grateful, but that she did not know if and when she could repay him. Belzberg replied: "Don't worry, you'll pay me back. You will repay me." During the call, Belzberg requested Lindbergh's bank information, and several days later, she received a large sum of money. When asked how she was treating the $223,655 she received, she stated: "I'm treating it as money Sam Belzberg gave me . . . because that's what he said." Lindbergh conceded that she had never heard of Winton before being served in this litigation, and still did not know who Winton was at the time of her testimony. Lindbergh also confirmed that there was no documentation for the loan, there was no timetable or plan for her to repay the money, and no interest terms were discussed.

After the hearing, the motion court permanently stayed the arbitration as to both Belzberg and Lindbergh. On this appeal, Verus does not challenge the court's determination with respect to Lindbergh, but maintains that Belzberg should be equitably estopped from avoiding arbitration. Verus argues that Belzberg should be compelled to arbitrate because he knowingly exploited and directly benefitted from the Verus-Jefferies customer agreement, which contained the arbitration clause.

The motion court should have compelled Belzberg to arbitrate. It is well settled that in certain circumstances, an intent to arbitrate may be imputed to a nonsignatory (*TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 339 [1998]). For example, "[a] nonsignatory to an agreement containing an arbitration clause that has knowingly received direct benefits under the agreement will be equitably estopped from avoiding the agreement's obligation to arbitrate" (*HRH Constr. LLC v Metropolitan Transp. Auth.*, 33 AD3d 568, 569 [2006]; *see Mark Ross & Co., Inc. v XE Capital Mgt., LLC*, 46 AD3d 296 [2007]; *Matter of SSL Intl., PLC v Zook*, 44 AD3d 429 [2007]).

Here, Belzberg should be estopped from avoiding arbitration because he knowingly exploited and received direct benefits from the customer agreement between Verus and Jefferies. Although Belzberg claimed that he acted only as a financial advisor to Winton, and that he had no stake in the proceeds transferred to Lindbergh, the record demonstrates otherwise. Belzberg specifically asked Khan if he could use Verus's brokerage account at Jefferies to process the Fording trade, and when Khan agreed, Belzberg initiated and orchestrated the entire transaction. After the securities were liquidated, Belzberg appropriated the $223,655 of trading profits by instructing Verus to transfer them to his good friend of 25 years so that she could buy a summer home, and then directed that she repay him.

Although the motion court characterized the transfer as a loan from Winton, the record shows that Belzberg, in his personal capacity, not Winton, gave the money to Lindbergh. There is no question that Lindbergh considered the money a loan from Belzberg, not Winton. During their phone conversation, Belzberg stated: "*I'm* going to send you some money," and "you'll pay *me* back. You will repay *me*" (emphasis added). It makes little sense that Winton would loan Lindbergh, an unemployed borrower who could not get a mortgage and who had no demonstrable connection to Winton, almost a quarter of a million dollars with no documentation, no repayment terms, no security and apparently no interest. Furthermore, Lindbergh's testimony that she had never heard of Winton under-

mines any claim that the loan came from Winton. And, contrary to Belzberg's testimony that he arranged for the $223,655 to be sent to Lindbergh "through Winton," the documentary evidence shows that the funds went directly from Verus's Jefferies account to Lindbergh, and that Winton never had possession of the money.

Additionally, the record reveals that Belzberg's hearing testimony is inconsistent with an earlier affidavit he filed in the litigation. In the affidavit, Belzberg stated that he is "merely a financial advisor of Winton, and . . . [has] no authority to act on behalf of or bind Winton." But at the hearing, Belzberg admitted that he has the power to make investments for Winton. Likewise, his affidavit statement that he "had no involvement in Winton's transfer of funds to Verus'[s] account at Jefferies or the purchase of Fording securities" is flatly contradicted by his hearing testimony that he directed that $5 million be transferred from Winton to the Jefferies account for purchase of the securities. Belzberg's contradictory statements on these material issues cast doubt on his present claim that the loan came from Winton and not him, and warrant our rejection of his factual characterization of the money transfer.

Contrary to Belzberg's argument, the benefit to him flowed directly from the customer agreement. The profits Belzberg diverted to Lindbergh were generated in the Fording trade that Belzberg orchestrated using Verus's account at Jefferies. As the motion court recognized when it ordered Winton to arbitrate, absent the Verus-Jefferies customer agreement, Belzberg would not have been able to place the trade with Jefferies. And, as Lindbergh testified, she will repay the money directly to Belzberg, which means that Belzberg will ultimately receive the profits from the trade. Because Belzberg knowingly exploited and directly benefitted from the Verus-Jefferies customer agreement, he should be estopped from avoiding the agreement's obligation to arbitrate (see Matter of SSL Intl., 44 AD3d at 430 [nonsignatories to a license agreement were estopped from seeking to avoid an arbitration provision since they marketed products that utilized technology covered by the license agreement]). Concur—Mazzarelli, J.P., Friedman, Richter and Abdus-Salaam, JJ.