[999 NE2d 1130, 977 NYS2d 685]

In the Matter of Samuel Belzberg, Appellant, et al., Petitioners, v Verus Investments Holdings Inc., Respondent.

Argued September 4, 2013; decided October 17, 2013

**POINTS OF COUNSEL**

*Kaye Scholer LLP*, New York City (*H. Peter Haveles, Jr.*, and *Stacey A. Lara* of counsel), for appellant. I. The Appellate Division erroneously ignored the clear limits on the application of the direct benefits estoppel doctrine. (*Steelworkers v Warrior & Gulf Nav. Co.*, 363 US 574; *AT&T Technologies, Inc. v Communications Workers*, 475 US 643; *John Hancock Life Ins. Co. v Wilson*, 254 F3d 48; *McMahan Sec. Co. L.P. v Aviator Master Fund, Ltd.*, 20 Misc 3d 386; *Merrill Lynch Inv. Mgrs. v Optibase, Ltd.*, 337 F3d 125; *Bridas S.A.P.I.C. v Government of Turkmenistan*, 345 F3d 347; *Thomson-CSF, S.A. v American Arbitration Assn.*, 64 F3d 773; *Denney v BDO Seidman, L.L.P.*, 412 F3d 58; *TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335; *MAG Portfolio Consultant, GmbH v Merlin Biomed Group LLC*, 268 F3d 58.) II. The trial court correctly held that Winton Capital Holding's liability cannot be imputed to Samuel Belzberg. (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135.)

*Wolf Haldenstein Adler Freeman & Herz LLP*, New York City (*Charles J. Hecht* and *Daniel Tepper* of counsel), for respondent. I. This appeal should be dismissed because it presents no issue of New York state law. (*N.J.R. Assoc. v Tausend*, 19 NY3d 597; *Matter of Diamond Waterproofing Sys., Inc. v 55 Liberty Owners Corp.*, 4 NY3d 247; *Southland Corp. v Keating*, 465 US 1.) II. The First Department correctly held that Samuel Belzberg must arbitrate this dispute under the doctrine of direct benefits estoppel. (*Smith/Enron Cogeneration Ltd. Partnership, Inc. v Smith*

*Cogeneration Intl., Inc.*, 198 F3d 88; *American Bur. of Shipping v Tencara Shipyard S.p.A.*, 170 F3d 349; *Deloitte Noraudit A/S v Deloitte Haskins & Sells, U.S.*, 9 F3d 1060; *Shearson/American Express Inc. v McMahon*, 482 US 220; *Legacy Wireless Servs., Inc. v Human Capital, L.L.C.*, 314 F Supp 2d 1045; *Sherman v Town of Rhinebeck*, 133 AD2d 77; *Wood v PennTex Resources, L.P.*, 458 F Supp 2d 355.)

## OPINION OF THE COURT

RIVERA, J.

In this CPLR article 75 proceeding, petitioner Samuel Belzberg (Belzberg) appeals an order of the Appellate Division that, inter alia, denied his application for a permanent stay of third-party arbitration claims (*see* 95 AD3d 713 [1st Dept 2012]). For the reasons that follow, we reverse.

In October 2008, Belzberg contacted a longtime business associate, Ajmal Khan, the principal of respondent Verus Investments Holdings Inc. (Verus), about an investment opportunity involving the purchase of securities in Fording Canadian Coal Trust to arbitrage a merger between Fording and another Canadian company (the Fording Trade). After several discussions about potential tax consequences, Belzberg and Khan decided to proceed with the Fording Trade. To complete the securities purchase Belzberg required an American brokerage account, and therefore agreed with Khan to use Verus' account at Jefferies & Co., Inc. (Jefferies). Belzberg's source for the investment money would be Winton Capital Holding (Winton), a British Virgin Islands corporation owned by a trust established by Belzberg and naming Belzberg's children as the sole beneficiaries, and for which Belzberg served as an unpaid financial advisor.[1] Belzberg directed that $5 million be sent from Winton to the Jefferies account for the purchase, and Verus wired an additional $1 million of its own funds.

After the merger, Jefferies wired to Verus both the original $5 million investment and $223,655.25 in profits attributable to the Winton funds. Verus thereafter wired the $5 million to Winton and upon instructions from Gibralt Capital, a Canadian holding company that Belzberg used to facilitate the Fording Trade, wired the profits to Doris Lindbergh (Lindbergh), a

---

1. The parties do not dispute Belzberg's status as a financial advisor, and therefore for purposes of this appeal we assume this to be his position at Winton.

friend of Belzberg. This money apparently was intended for Lindbergh to purchase a summer home.[2]

The Canadian tax authorities thereafter informed Jefferies that it owed a $928,053.45 withholding tax on the Fording Trade. Pursuant to the arbitration clause in the agreement between Jefferies and Verus (Jefferies-Verus agreement), Jefferies commenced an arbitration against Verus for the unpaid taxes before the Financial Industry Regulatory Authority. Verus answered and asserted third-party arbitration claims against Belzberg, Lindbergh, Winton, and Gibralt for their share of the taxes.

Belzberg, Lindbergh, Winton, and Gibralt filed an article 75 petition to stay arbitration of the third-party claims, and Verus cross-moved to compel arbitration. Supreme Court permanently stayed the arbitration as against Gibralt, granted the motion to compel Winton to arbitrate, and held the proceeding against the remaining parties in abeyance, pending a hearing on the petition and cross motion as to Belzberg and Lindbergh.

At the hearing, Lindbergh testified as to the money Belzberg had forwarded her. Among other things, she claimed that Belzberg had told her to pay him back when she could. The court considered Belzberg's out-of-state deposition, in which Belzberg claimed that he had no ownership interest in Winton. Supreme Court determined that nonsignatories Belzberg and Lindbergh could not be compelled to arbitrate. The court concluded that the doctrine of arbitration by estoppel, which requires that a nonsignatory to an arbitration agreement receive a "direct benefit" from the agreement in order to be compelled to arbitrate a claim, did not apply, because Belzberg did not receive a benefit which flowed directly from the Jefferies-Verus agreement, and Lindbergh did not knowingly exploit that agreement.

On appeal, the Appellate Division reversed. The court determined that Belzberg should be estopped from avoiding arbitration because he knowingly exploited and received direct benefits from the agreement between Jefferies and Verus. It concluded that Belzberg diverted the profits from the trade to Lindbergh, and thus he directly benefitted from the agreement which made possible the trade that resulted in the profits. This

---

**2.** The parties contest whether this was a loan or a gift, and whether the source was Belzberg or Winton. However, it is undisputed that there is no written document setting forth the terms and understandings related to this money, including whether or when it would be repaid.

Court granted Belzberg's motion for leave to appeal (19 NY3d 812 [2012]).

Belzberg now argues that the Appellate Division erroneously applied the direct benefits estoppel doctrine because he did not receive a direct benefit from the underlying agreement between Verus and Jefferies. Verus asserts that the Appellate Division properly concluded that Belzberg derived a direct benefit from the Jefferies-Verus agreement because he directed the profits to his friend Lindbergh. We conclude that Belzberg did not receive a direct benefit from the arbitration agreement, and cannot be compelled to arbitrate.

Arbitration is a matter of contract (*see Thomson-CSF, S.A. v American Arbitration Assn.*, 64 F3d 773, 776 [2d Cir 1995]), "grounded in agreement of the parties" (*County of Sullivan v Edward L. Nezelek, Inc.*, 42 NY2d 123, 128 [1977]). As a consequence, notwithstanding the public policy favoring arbitration (*see TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 339 [1998]), nonsignatories are generally not subject to arbitration agreements (*see Steelworkers v Warrior & Gulf Nav. Co.*, 363 US 574, 582 [1960] ["a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"]; *see also Thomson-CSF*, 64 F3d at 776 [arbitration agreements "must not be so broadly construed as to encompass claims and parties that were not intended by the original contract"]). However, under limited circumstances nonsignatories may be compelled to arbitrate (*see TNS Holdings*, 92 NY2d at 339 [recognizing "in certain limited circumstances the need to impute the intent to arbitrate to a nonsignatory"]).

Some New York courts have relied on the direct benefits estoppel theory, derived from federal case law, to abrogate the general rule against binding nonsignatories (*see Matter of SSL Intl., PLC v Zook*, 44 AD3d 429 [1st Dept 2007]; *HRH Constr. LLC v Metropolitan Transp. Auth.*, 33 AD3d 568 [1st Dept 2006]; *see also Oxbow Calcining USA Inc. v American Indus. Partners*, 96 AD3d 646 [1st Dept 2012]).[3] On this appeal, we must consider whether by application of this theory Belzberg may be estopped from avoiding arbitration.

---

**3.** In addition to estoppel, federal courts have relied on other theories as a basis by which to bind nonsignatories to an arbitration agreement: incorporation by reference, assumption, agency, and veil-piercing/alter ego (*see Thomson-CSF*, 64 F3d at 776). Verus unsuccessfully asserted a claim under the pierced corporate veil theory. This theory of individual liability "is typically employed by a third party seeking to go behind the corporate existence in order to

(n. cont'd)

Under the direct benefits theory of estoppel, a nonsignatory may be compelled to arbitrate where the nonsignatory "knowingly exploits" the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement (*see MAG Portfolio Consultant, GmbH v Merlin Biomed Group LLC*, 268 F3d 58, 61 [2d Cir 2001] ["Under the estoppel theory, a company 'knowingly exploiting (an) agreement (with an arbitration clause can be) estopped from avoiding arbitration despite having never signed the agreement' "]; *see also Deloitte Noraudit A/S v Deloitte Haskins & Sells, U.S.*, 9 F3d 1060, 1064 [2d Cir 1993] ["Noraudit knowingly accepted the benefits of the Agreement through its continuing use of the name 'Deloitte' "]; *Reid v Doe Run Resources Corp.*, 701 F3d 840, 846 [8th Cir 2012] ["Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause"], quoting *Bridas S.A.P.I.C. v Government of Turkmenistan*, 345 F3d 347, 361-362 [5th Cir 2003]).

Where the benefits are merely "indirect," a nonsignatory cannot be compelled to arbitrate a claim. A benefit is indirect where the nonsignatory exploits the contractual relation of the parties, but not the agreement itself (*see MAG Portfolio*, 268 F3d at 61 ["The benefits must be direct—which is to say, flowing directly from the agreement. . . . By contrast, the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself"], citing *Thomson-CSF*, 64 F3d at 778-779).

Federal courts have grappled with this dichotomous approach to imposing arbitration on nonsignatories. The analysis in several cases provides useful guidance on how to apply the theory. For example, in *Deloitte*, the Second Circuit found that there is a direct benefit where the contract at issue is the direct source of the benefit. Deloitte Haskins & Sells (Deloitte) and its affiliates formed, via a memorandum agreement, an international association called Deloitte Haskins & Sells International (DHSI). Noraudit was the Norwegian affiliate of DHSI. DHSI decided to merge with Touche Ross International, another accounting firm. DHSI settled several merger-related issues with

---

circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation" (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 140-141 [1993]). Verus has not challenged Supreme Court's rejection of this theory of liability, and therefore it is not before us on appeal.

its affiliates by signing a settlement agreement giving them limited use of the name "Deloitte." Noraudit apparently approved the settlement agreement without signing it, continued to use the name "Deloitte," and sued DHSI to obtain a declaration that it had the right to use the "Deloitte" name in Norway. DHSI sought to compel arbitration on the basis of the arbitration clause contained in the settlement agreement. Noraudit asserted that its claim was governed by the memorandum agreement giving rise to DHSI, and that it was not a signatory to the settlement agreement. The Second Circuit held that Noraudit "failed to object to the Agreement when it received it and offers no persuasive reason for its inaction" and "knowingly accepted the benefits of the Agreement through its continuing use of the name 'Deloitte.' " As a result, Noraudit was estopped from denying its obligation to arbitrate under the second agreement (see *Deloitte*, 9 F3d at 1064).

In contrast, in *Thomson-CSF*, the Second Circuit concluded that the nonsignatory did not derive any direct benefit where it merely purchased a company that had entered an exclusive contract with a competitor of the nonsignatory, thus eliminating the competitor's ability to compete in the market. Thomson, a flight simulation equipment builder, acquired Rediffusion, a British company also engaged in the business of building flight simulators. Rediffusion previously entered into a "Working Agreement" with E & S, whereby Rediffusion agreed to purchase certain computer-generated imaging equipment exclusively from E & S, in exchange for E & S agreeing to supply its imaging equipment solely to Rediffusion. The Working Agreement contained an arbitration clause. At some point, E & S informed Thomson that it intended to bind Thomson to the Working Agreement. Thomson subsequently asked E & S to waive those provisions of the Working Agreement that E & S believed were binding upon Thomson. The parties were unable to resolve the dispute, and E & S sought to compel arbitration against Thomson, claiming that Thomson had received a direct benefit from the Working Agreement in the form of increased market share. According to E & S, Thomson purchased Rediffusion, a competitor in the flight simulation industry, so that it could keep Rediffusion from selling its flight simulators. Since Thomson was able to eliminate all simulators utilizing E & S imaging equipment from the market, and E & S was contractually bound to supply Rediffusion, the company claimed that Thomson benefitted from the Working Agreement. The Second

Circuit rejected that claim, holding that "[t]he benefit which E & S asserts . . . derives directly from Thomson's purchase of Rediffusion, and not from the Working Agreement itself; Thomson received no benefit at all from the Working Agreement (as opposed to the acquisition)" (*Thomson-CSF*, 64 F3d at 779).

In *Lang v First Am. Tit. Ins. Co.* (2012 WL 5221605, 2012 US Dist LEXIS 151579 [WD NY, Oct. 22, 2012, No. 12 CV 266S]), the court concluded that the nonsignatory was not subject to arbitration because the benefit derived from a business relationship independent of the contract containing the arbitration provision. The court held that a plaintiff's ability to secure a refinanced mortgage from a lender was not a "direct benefit" compelling arbitration of a claim for excessive premiums against the defendant title insurer, because the purported benefit came from a "contractual relationship" between the lender and the defendant title insurer (2012 WL 5221605, *4, 2012 US Dist LEXIS 151579, *11-12).

In *Carvant Fin. LLC v Autoguard Advantage Corp.* (— F Supp 2d —, 2013 WL 3991471, 2013 US Dist LEXIS 109524 [ED NY, Aug. 5, 2013, No. 13 CV 00872 (ADS)(AKT)]), the court considered whether the agreement affects some independent contractual relationship of the nonsignatory. In *Carvant*, the court concluded that the plaintiff, a used car financing company, was required to arbitrate a breach of contract claim concerning service contracts between an automobile servicer and an insurance company. The court concluded that plaintiff received a "direct benefit" from the agreements in the form of liens on the used cars (— F Supp 2d at —, 2013 WL 3991471, *5-6, 2013 US Dist LEXIS 109524, *16-17 ["Indeed, in exchange for financing the Service Contracts between its customers and the Defendants, the Plaintiff enjoyed a lien on each motor vehicle and thus received a 'direct benefit' from the agreements"]).

As the cases illustrate, given the various nuances of contractual arrangements and that nonparties may derive some value from others' agreements, it can be difficult to distinguish between direct and indirect benefits. The guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause. The mere existence of an agreement with attendant circumstances that prove advantageous to the nonsignatory would not constitute the type of direct benefits justifying compelling arbitration by a nonparty to the underlying contract. Also, absent the nonsignatory's reliance on the agreement itself for

the derived benefit, the theory would extend beyond those who gain something of value as a direct consequence of the agreement.

Verus asserts that this estoppel theory applies to compel Belzberg to arbitrate because he derived a direct benefit from the Jefferies-Verus agreement—namely the profits attributable to the $5 million Winton investment in the Fording Trade. Belzberg denies any such direct benefit and asserts that the funds from the Fording Trade belong to Winton. We agree that Belzberg did not receive the type of direct benefit from the Jefferies-Verus agreement encompassed by this estoppel theory.

We are not persuaded by Verus' argument that Belzberg's diversion to his friend of the profits attributable to Winton's investment in the Fording Trade constitutes a direct benefit from the underlying Jefferies-Verus agreement. The profits belong to Winton, not Belzberg. Belzberg's access to, and appropriations of, the profits is based not on any agreement involving Jefferies and Verus, but rather on his relationship with Winton. It is in his position as financial advisor that Belzberg gained access to the profits attributed to Winton's $5 million investment. Belzberg's ability to divert those profits flows directly from his status vis-à-vis Winton, not as a result of any relationship with Verus or Jefferies, and certainly not based on the underlying agreement between those parties.

Of course, but for the Fording Trade, and Verus and Belzberg's use of the Jefferies account, there would be no profits for Belzberg to divert to his friend for her personal use. However, a connection based on mere extended causality is beyond the intended scope of the direct benefits estoppel theory. Belzberg is several steps removed from the formation of the arbitration agreement between Jefferies and Verus. In order to compel Belzberg to arbitrate the direct benefits theory of estoppel would have to recognize that the benefit flows initially from Belzberg's relationship with Winton, allowing him the ready access to investment funds and trade profits, then from the use of the Jefferies-Verus agreement to accomplish the financial investment that resulted in the profits, followed by the final event in which Belzberg takes the profits for his own use, i.e., to give his friend the money to purchase a summer home. This is simply too attenuated a connection to justify application of the direct benefits estoppel theory, a theory intended as justification for an exception to the usual rule that nonsignatories cannot be compelled to arbitrate.

Belzberg's use of the profits attributed to Winton's original investment may breach his duty or some role assumed on behalf of Winton, or otherwise constitute an opportunistic self-serving exercise of his position with Winton, but the use of such monies does not flow from the Jefferies-Verus agreement.

The Appellate Division order should be reversed, with costs, petition by Samuel Belzberg to permanently stay the arbitration as to him granted and cross petition to compel him to arbitrate denied.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH and PIGOTT concur; Judge ABDUS-SALAAM taking no part.

Order reversed, with costs, petition to permanently stay the arbitration as to petitioner Samuel Belzberg granted and cross petition to compel Belzberg to arbitrate denied.