In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 22-2813

ALEX COATNEY, individually and on behalf of similarly situated individuals, *et al.*,

*Plaintiffs-Appellees*,

*v.*

ANCESTRY.COM DNA, LLC,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:21-cv-01368-DWD — **David W. Dugan**, *Judge*.

---

ARGUED DECEMBER 6, 2023 — DECIDED FEBRUARY 15, 2024

---

Before FLAUM, EASTERBROOK, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Ancestry.com sells genealogy tools to aid users in researching their family history. Registered users of its website must first agree to an arbitration clause. In this case, guardians activated DNA test kits through their accounts on behalf of their children. Those children are the plaintiffs here. When another business acquired Ancestry, the plaintiffs contended that Ancestry violated their privacy

rights by disclosing confidential genetic information and sued. Ancestry moved to compel arbitration.

Sitting in diversity and applying Illinois law, the district court ruled that the plaintiffs were not bound to arbitrate their claims under an agreement between their guardians and Ancestry. We agree and affirm the decision of the district court.

## I. Background

Ancestry.com DNA, LLC is a genealogy and consumer genomics company.[1] Users who create online accounts may purchase a DNA test kit through which Ancestry collects consumer saliva samples. Ancestry then analyzes the genetic information in those samples and returns genealogical and health information to the purchaser through its website.

Individuals who purchase and activate Ancestry DNA test kits must agree to Ancestry's Terms & Conditions. Under the Terms, only adults may purchase or activate a DNA test kit. However, minors thirteen to eighteen years old may still use Ancestry's DNA service. A parent or legal guardian may activate a DNA test kit and send in a minor's saliva sample using an account for the child that the parent or guardian manages.

Between 2016 and 2019, guardians purchased and activated test kits on behalf of plaintiffs, who were all minors at the time. When activating the kits, the guardians took a number of steps. In January 2016, N.S.'s guardian accessed Ancestry's website to enter N.S.'s personal information, confirm she was a parent or guardian providing a minor's DNA, and

---

[1] Genomics is a field of biology focused on studying all the DNA of an organism—that is, its genome. National Human Genome Research Institute. https://www.genome.gov/genetics-glossary/genomics

verify her review and acceptance of the Terms. Coatney's guardian followed a similar process when activating a DNA test kit on Coatney's behalf in December 2017, and also completed additional, separate terms contained in a DNA Processing Consent. H.S.'s and B.H.'s guardian completed these same steps when activating test kits in August and September of 2019.[2]

The DNA Processing Consent lists several provisions related to Ancestry's use of a minor's DNA and a guardian's agreement. It states, "When you activate your child's DNA test kit, you consent to Ancestry's collection and processing of your child's DNA data." A guardian's consent grants Ancestry permission to, among other things:

- "Convert the physical DNA sample into DNA data and use your child's DNA data to provide reports about your child's ancestral origins;"

- "Identify your child's potential relatives;" and

- "Use your child's DNA data … to help you and your child discover other details about your family history."

The Terms, in each iteration, contain a dispute resolution provision, binding the parties to arbitration and waiving any class actions. Language in the Terms notifies Ancestry's users that continued use of Ancestry's services after a change to the Terms constitutes acceptance of that change. The Terms also

---

[2] H.S.'s and B.H.'s guardian—Donna Roberts—had previously created an Ancestry account in 2015 and accepted the Terms. Roberts maintained her account through multiple updates of the Terms, including those in effect at the same time she activated DNA test kits on H.S.'s and B.H.'s behalf.

include specific provisions pertaining to Ancestry's DNA Services:

> "DNA Services" refers to the use of our DNA collection kit, processing and handling of your DNA sample, genetic testing of your DNA sample, and our web or mobile app-based tools that provide you with ethnicity and other genetically related results and associated services, offer you the ability to view genetic matches that can identify potential relatives, help you explore your ethnic and family origins, and make new discoveries through your DNA.

As the Terms explain, "[t]he purpose of the DNA Services is to provide genetic and genealogy results and related reports for your informational, recreational, educational, and research use."

The Terms did not require the plaintiffs to read them. Plaintiffs allege they did not, and also that they did not create Ancestry accounts. Nor did plaintiffs ever access their guardians' accounts, receive their DNA test results, or interact with Ancestry's website in any way before filing suit.

In 2020, Blackstone, Inc. acquired Ancestry. Plaintiffs sued Ancestry in federal court, claiming that the acquisition resulted in Ancestry disclosing genetic test results and personal, identifying information to Blackstone without obtaining written authorization, in violation of the Illinois Genetic Information Privacy Act. *See* 410 ILL. COMP. STAT. 513/1, *et seq.* Plaintiffs filed a purported class action under the Class Action Fairness Act, and the district court had diversity jurisdiction under 28 U.S.C. § 1332(d).

Under the Terms' dispute resolution provisions, Ancestry moved to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4. The district court denied Ancestry's motion. To that court, it was clear that Ancestry and plaintiffs' guardians had agreed to arbitration, but that court still had to decide whether plaintiffs were also bound by the agreement.

First, the district court rejected Ancestry's assertion that plaintiffs assented to the Terms by agreeing to use Ancestry's services and submitting their DNA tests through their guardians' accounts or through their guardians' execution of consent forms on plaintiffs' behalf. The court did not read the Terms' plain, unambiguous language to support that assertion. Plaintiffs neither signed the Terms nor created Ancestry accounts, so the district court declined to find that plaintiffs had consented to those Terms. Further, plaintiffs did not activate their own DNA tests or otherwise independently engage with Ancestry's services.

Second, the district court concluded that equitable principles did not bind plaintiffs to the Terms. Specifically addressing a theory of direct benefits estoppel, the court noted, "it is hard to imagine what benefit … Plaintiffs received from the processing of their DNA," where there were no allegations that Plaintiffs accessed their guardians' Ancestry accounts or their DNA test results.

Ancestry timely filed this interlocutory appeal. "Interlocutory appeals from denials of motions to order arbitration are authorized by 9 U.S.C. § 16(a)(1)(B)." *Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157, 1157 (7th Cir. 2015).

## II. Discussion

Ancestry urges us to reverse the district court's denial of its motion to compel arbitration on three grounds:

- Plaintiffs' guardians assented to the Terms on their behalf;

- Plaintiffs are "closely related" parties to their guardians (or even third-party beneficiaries), foreseeably bound by the Terms; or

- As direct beneficiaries of the Terms, plaintiffs are estopped from avoiding them.

We review de novo a district court's denial of a motion to compel arbitration and the "findings of fact underlying that decision for clear error." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 638 (7th Cir. 2021). The district court's application of equitable doctrines is reviewed for an abuse of discretion. *Id.*

Before addressing Ancestry's arguments, we review some general legal principles surrounding arbitration. The FAA "requires federal and state courts to place written arbitration agreements on the same footing as other contracts." *Scheurer v. Fromm Family Foods, LLC*, 863 F.3d 748, 752 (7th Cir. 2017) (citing 9 U.S.C. § 2). A court must compel arbitration under the FAA when three elements exist: "(1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Id.* (citing 9 U.S.C. § 4).

Arbitration is contractual, and "[a] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quotations omitted). It is a "bedrock principle" that "an arbitration agreement generally cannot

bind a non-signatory." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1059 (7th Cir. 2018). Whether an arbitration agreement is enforceable against a non-party is a question governed by "traditional principles of state law." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *Scheurer*, 863 F.3d at 752. State law typically provides only for a handful of limited exceptions to the general prohibition against binding non-signatories: "(1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference." *A.D.*, 885 F.3d at 1059–60 (citing *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)).

Illinois law governs, so we turn there for the specific legal rules to resolve this appeal, mindful that we must ascertain those principles as Illinois would understand them, even if faced with a lack of a ready answer. Two "guardrails" keep us on course. *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 928 (7th Cir. 2024). First, "in the absence of prevailing authority from the state's highest court," we "give great weight to the holdings of the state's intermediate appellate courts." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). We deviate from those holdings only where there are "persuasive indications that the highest court of the state would decide the case differently." *Id.* Second, when presented with "two equally plausible readings of state law," we "should not choose the alternative that requires us to predict a change or an expansion in extant state legal doctrine." *Green Plains Trade Group*, 90 F.4th at 929.

**A. Assent by Conduct**

Ancestry argues that "[t]he conduct of Plaintiffs' guardians unambiguously established consent to Ancestry's Terms on Plaintiffs' behalf," making plaintiffs direct parties. That

conduct, Ancestry submits, occurred when a guardian activated a DNA test kit in a plaintiff's name, verified their guardian status, agreed to the Terms, sought a plaintiff's consent to collect and submit their DNA, and administered the DNA test.

Looking to Illinois law, our analysis begins with the Terms' language, which we "endeavor to give … 'its plain and ordinary meaning.'" *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC – Arlington Place One*, 20 F. 4th 359, 372 (7th Cir. 2021) (quoting *Gallagher v. Lenhart*, 874 N.E.2d 43, 58 (Ill. 2007)). The goal of Illinois contract law "is to give effect to the intent of the parties as demonstrated through objective conduct." *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (citing *Carey v. Richards Bldg. Supply Co.*, 856 N.E. 2d 24, 27 (Ill. 2006)).

That plain and ordinary meaning is unambiguous here. Plaintiffs are not express parties to the Terms. As shown in the use of "you" throughout the Terms, the only parties to the agreement are the signatory and Ancestry. The Terms also say they "are personal" to the signatory, who "may not … assign or transfer any … rights and obligations" established by them.

Ancestry's only counter to the Terms' plain language is an unpublished district court decision, *Burns v. Wilderness Ventures, Inc.*, No. 12 C 4188, 2012 WL 3779069 (N.D. Ill. Aug. 30, 2012). There, the father of a deceased sixteen-year-old girl sued on behalf of her estate after she was killed in an accident while taking part in defendant's wilderness program. *Id.* at *1. The minor and her mother signed two contracts with the defendant. *Id.* at *2. Each contract contained a forum selection clause setting Teton County, Wyoming as the sole jurisdiction and venue of any legal proceeding arising out of the

wilderness program.[3] *Id.* The contracts also contained language informing a signatory parent or guardian that their signature was "on behalf of the Participant, myself, and my spouse … ." *Id.*

Burns sued, and Wilderness Ventures moved to dismiss for improper venue. *Id.* at *1. Burns claimed the forum selection clause could not bind his daughter's estate. *Id.* at *3. The district court rejected this argument. The decedent's mother signed the contracts as an individual and as the girl's guardian. The court also found persuasive authority permitting a parent or guardian to bind their minor child to a specific forum or arbitration because such agreements do not limit the minor's "substantive right to sue," but only "limit the procedural avenues of such suit to those mutually agreed." *Id.*

Ancestry urges us to follow *Burns*, but we decline for two reasons. First, the court in *Burns* did not enforce the forum selection clause based on the parents' conduct. Rather, the court did so because her mother signed contracts explicitly noting that a guardian's signature constituted agreement on behalf of the minor child. *Id.* Nothing in *Burns* discusses any conduct, outside of signing the contracts, that purportedly bound the decedent to the forum selection clause. Second, the contracts in *Burns* differ markedly from the Terms here. The decedent's mother signed the contracts with the forum selection clause "on behalf of" her minor child. *Id.* at *2. Ancestry's Terms do not say plaintiffs' guardians agreed to them "on behalf of" their children. Ancestry correctly points out that in

---

[3] Because arbitration clauses are a type of forum selection clause, *see Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014), authorities involving forum selection clauses are useful in our analysis.

*Burns*, the court ignored the decedent's own signature. *Id.* at *3. Here, though, the only "on behalf of" (or similar language) was not in Ancestry's own contract, but in the DNA Processing Consent. That Consent says nothing about binding plaintiffs to the Terms—indeed, it does not mention the Terms at all.[4]

---

[4] When contending that the guardians' conduct bound plaintiffs to the Terms, Ancestry cites a smattering of cases not from Illinois or from outside this circuit. These cases are distinguishable.

Two concerned arbitration clauses comparable to the forum selection clause in *Burns*, indicating that agreement to them was on behalf of the minor child. *See Glob. Travel Mkt., Inc. v. Shea*, 908 So.2d 392, 395 (Fla. 2005) ("I, as parent or legal guardian of the below named minor, … agree, individually and on behalf of my child or ward, to the terms of the above."); *Cross v. Carnes*, 724 N.E.2d 828, 831 (Oh. App. Ct. 1998) (noting that the form containing the arbitration clause included two signature lines for the parent to sign, one for the parent individually and the other on behalf of her minor daughter). Another was not decided on comparable grounds; rather, the court concluded that a parent's agreement to arbitrate a minor's potential tort claims generally does not run contrary to public policy concerns. *Hojnowski v. Vans Skate Park*, 901 A.2d 381, 391 (N.J. 2006).

The last case Ancestry cites on this point, *Dillon v. Ski Shawnee, Inc.*, No. 13-7155, 2014 WL 3900877 (D.N.J. Aug. 11, 2014), is too brief to help. There, a mother purchased ski lift tickets and agreed to a forum selection clause setting forum in New Jersey state court, for herself and her minor daughter. *Id*. at *1. Following the daughter's injury at defendant's ski area, the mother and daughter sued; defendant sought to enforce the forum selection clause. *Id.* The plaintiffs argued the daughter never agreed to the clause, as she did not purchase a lift ticket. The district court rejected this argument, concluding "[a] parent can bind a minor child to a forum-selection clause to which the parent agreed to enter." *Id.* at *2. Without more analysis, *Dillon* does not help us decide whether the guardians' conduct bound plaintiffs to the Terms.

**B. Closely Related and Third-Party Beneficiary Arguments**

Even if plaintiffs are not direct parties under the plain language of the Terms, Ancestry submits they are bound either as closely related parties or third-party beneficiaries.

The company mounts these arguments from shaky legal ground, as Illinois "recognize[s] a strong presumption against conferring contractual benefits on noncontracting third parties." *Sosa*, 8 F.4th at 639 (quotations omitted); *see also Estate of Willis v. Kiferbaum Const. Corp.*, 830 N.E.2d 636, 642 (Ill. App. Ct. 2005); *Ball Corp. v. Bohlin Bldg. Corp.*, 543 N.E.2d 106, 107 (Ill. App. Ct. 1989); *Midwest Concrete Prods. Co. v. La Salle Nat'l Bank*, 418 N.E.2d 988, 990 (Ill. App. Ct. 1981) (quoting 17 AM. JUR. 2d *Contracts* § 304, at 729–30 (1964)). That presumption is overcome only where "the implication" that the contract applies to a third party is "so strong as to be practically an express declaration." *Sosa*, 8 F.4th at 639 (quoting *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991)). Showing that the "parties know, expect, or even intend that others will benefit from the agreement" will not suffice to overcome the presumption against third-party beneficiaries. *Id.* (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 117 N.E.3d 1155, 1159 (Ill. App. Ct. 2018)). "Instead, for a nonparty to qualify as a third-party beneficiary, the language of the contract must show that 'the contract was made for the direct, not merely incidental, benefit of the third person.'" *Id.* (quoting *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009)). That showing exists only in "an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the party belongs." *Id.*

Importantly, the Terms exclude third-party beneficiaries: "There shall be no third-party beneficiaries to this Agreement." Ancestry seeks to avoid this exclusion, citing one case for the proposition that general provisions excluding third-party beneficiaries do not supersede more specific language included elsewhere. *See Barba v. Village of Bensenville*, 29 N.E.3d 1187, 1194–95 (Ill. App. Ct. 2015). But the only specific language Ancestry points to are the provisions in the DNA Processing Consent. Most of that language, like most of the Terms' provisions, uses "you" and "your" to refer to the person executing the DNA Processing Consent: the child's parent or guardian.

Illinois' strong presumption against conferring contractual benefits on noncontracting third parties, as well as the Terms' express prohibition, hobbles Ancestry's position. The law on closely related parties and third-party beneficiaries does not strengthen it.

> *i. Plaintiffs are not closely related parties foreseeably bound by the Terms.*

A nonparty will be bound by a forum selection clause if the nonparty is "closely related" to the dispute "such that it becomes foreseeable that [the nonparty] will be bound." *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (quotation marks omitted);[5] *Solargenix Energy, LLC v. Acciona, S.A.*, 17 N.E.3d 171, 183 (Ill. App. Ct. 2014) (adopting *Hugel*'s

---

[5] In *Hugel*, we concluded that third-party beneficiary status would satisfy the "closely related" and "foreseeability" requirements, while also recognizing that a showing of third-party beneficiary status is not required for a showing that a party is closely related. 999 F.3d at 209–10 n. 7.

closely related parties test). "Where there is a sufficiently close relationship between the non-signatory and the dispute and the parties, it does not defy the non-signatory's reasonable expectations that it would be bound." *Solargenix*, 17 N.E.3d at 185.

Ancestry asks us to apply *Hugel* and *Solargenix* to reverse the district court's decision that plaintiffs are not closely related parties foreseeably bound to the Terms. To Ancestry, the plaintiffs, as minors under the guardians' supervision, are closely related to them. The guardians consented to the Terms when activating the DNA test kits. So, it was foreseeable, should a dispute arise, that plaintiffs would be bound by the Terms.

But *Hugel* and *Solargenix* do not extend as far as Ancestry would like. In *Hugel*, a company, its subsidiary, and their president and chairman, Hugel, sued Lloyd's over a business dispute in Illinois federal district court. 999 F.2d at 207. When Lloyd's attempted to enforce a forum selection clause fixing the legal forum in England, the companies argued that the clause applied only to Hugel, who signed the agreement including the forum selection clause. *Id.* The district court refused to exercise jurisdiction. *Id.* Our court affirmed, holding that the district court did not clearly err in finding that the companies were so closely related to the dispute between Hugel and Lloyd's. *Id.* at 210. Hugel was president and chairman of both companies and owned 99 percent of the parent company's stock, which in turn owned 100 percent of the subsidiary's stock. *Id.* at 209–10. Hugel and the companies were essentially one.

*Solargenix* required an Illinois state court to decide whether it could exercise personal jurisdiction over Spanish

companies whose American subsidiaries agreed to a joint venture that contained a forum selection provision fixing venue in Chicago. 17 N.E.3d at 174, 177. Adopting *Hugel*'s closely related parties test, the Illinois appellate court affirmed the lower court's exercise of jurisdiction over the Spanish companies. *Id.* at 182, 189. Jurisdictional discovery revealed that the Spanish companies, as parents of the American subsidiaries, "were heavily involved in negotiating and approving the joint venture agreements." *Id.* at 182. This involvement showed the Spanish companies' close relation to the dispute and made it foreseeable that any dispute arising from the joint venture would reasonably result in binding them to the agreement's forum selection clause. *Id.* at 189.

*Hugel* and *Solargenix* present two circumstances in which a non-signatory is a closely related party to an agreement and foreseeably bound by its terms. In the first, the non-signatory's identity is so intertwined with the identity of the signatory that the two cannot be distinguished. In the second, the non-signatory is deeply involved in the negotiation of the contractual terms.

Neither scenario applies to plaintiffs. Though a special relationship exists between plaintiffs and their guardians, in fact and in law that relationship does not join their identities, as can be the case with parent and subsidiary corporations. Further, neither plaintiffs nor their guardians negotiated the Terms. Indeed, there is no evidence plaintiffs even knew the Terms.

*ii. Plaintiffs are not third-party beneficiaries under Illinois law.*

Ancestry asserts plaintiffs benefited from the Terms such that they should be considered third-party beneficiaries to them. To the company, "Plaintiffs were intended to—and did—benefit from the agreements with Ancestry." That is because "Ancestry sequenced and analyzed *Plaintiffs'* DNA to generate insights about *Plaintiffs'* genetic history." For support, Ancestry points to a provision in the DNA Processing Consent, stating Ancestry would "[u]se your child's DNA data … to help you and your child discover other details about your family history."

This court's decision in *Sosa* is instructive in evaluating Ancestry's argument. There, a non-signatory sought to enforce an arbitration clause. Sosa filed a class action suit against Onfido, alleging that the company used technology without his consent to extract biometric identifiers in violation of the Illinois Biometric Information Privacy Act. *Sosa*, 8 F.4th at 635. Sosa's interaction with Onfido's software, TruYou, came through his use of OfferUp, an online marketplace that partnered with Onfido to verify consumers' identities. *Id.* When Sosa registered with OfferUp and used its app, he agreed to OfferUp's Terms of Service and a mandatory arbitration provision. Onfido was not named in the Terms of Service, but its software was. Onfido sought to compel arbitration, arguing that it was a third-party beneficiary of the Terms of Service based on the references to its software. *Id.* at 636.

In *Sosa*, we rejected Onfido's argument that it qualified as a third-party beneficiary. *Id.* at 639–40. The language on which Onfido relied "simply prohibit[ed] OfferUp users from using the TruYou feature without first obtaining necessary

permissions … or if their use of the feature would violate" laws or regulations. *Id.* at 639. "Nothing in the Terms of Service indicate[d] that this section or the contract as a whole were intended for the direct benefit of Onfido." *Id.* Moreover, even if "Onfido ultimately incidentally incurred a benefit from the contract's TruYou provision, that [was] not sufficient to demonstrate that Onfido qualifie[d] as a third-party beneficiary under Illinois law." *Id.* We concluded that the OfferUp Terms of Service, "[r]ead as a whole … neither provide any benefit to Onfido nor give Onfido a right to enforce the arbitration provision." *Id.* at 640.

As with the terms of service in *Sosa*, the Terms here do not state that they were intended for the direct benefit of plaintiffs. Admittedly, they are slightly more specific than those in *Sosa*. The DNA Processing Consent, incorporated into the Terms, contemplates that consent to Ancestry's processing and analysis of a child's DNA will enable Ancestry's provision of:

- Reports about the child's ancestral origins;

- Insights about the "child's ethnicity, places of origin, ancestors, individual traits, and characteristics;"

- Identification of potential relatives; and

- The ability to "to help you and your child" discover other details about family history.

But nothing in the DNA Processing Consent says the Terms are for plaintiffs' direct benefit. The only reference in the Terms to minors is as possible subjects from whom saliva samples could be collected.

Additionally, the Terms' arbitration provision did not intend to directly benefit plaintiffs. In *Johnson v. Noble*, the relevant provision stated that certain disputes "between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), shall be arbitrated." 608 N.E.2d 537, 539 (Ill. App. Ct. 1992). The Illinois Appellate Court ruled that the third-party beneficiary doctrine to compel arbitration is properly applied when the non-signatory was to derive a benefit from the agreement and "where the arbitration clause itself is susceptible to this interpretation." *Id.* at 541. The court reasoned that the relevant provision included two non-signatories as third-party beneficiaries because they were "associated persons with a member … as stated in the agreement." *Id.*

Here, the Terms' arbitration provision does not contain language capturing the plaintiffs. As with language elsewhere in the Terms, the provision refers to "you and Ancestry," and "dispute[s] between us." This language indicates that the signatories intended to bind themselves, but not others, to arbitration.

The Terms are presumed to directly benefit its signatories, who are Ancestry and the guardians. That both knew, expected, or even intended for plaintiffs to benefit from the agreement does not overcome that presumption. If Ancestry and the guardians expected plaintiffs to directly benefit from the Terms, the Terms do not state that. Ancestry did not include language memorializing its contrary intent, defeating their third-party beneficiary argument.

**C. Direct Benefits Estoppel**

Ancestry offers one other theory to rebut the presumption under Illinois law against binding non-signatories to contracts. As direct beneficiaries of their guardians' agreement to the Terms, plaintiffs are estopped from avoiding its arbitration provision. Though Illinois state courts have not applied direct benefits estoppel to enforce arbitration against a non-signatory, Ancestry argues that this court in *Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380 (7th Cir. 2014), and other federal courts have employed direct benefits estoppel to bind non-signatories to arbitration. The company submits that it sequenced plaintiff's DNA samples, "the precise benefit Plaintiffs sought when they 'discussed the DNA test … and … agreed to the collection and processing of their saliva.'" To Ancestry, this benefit to plaintiffs flows directly from the Terms containing the arbitration provision, "because Ancestry would have never provided services without those agreements."

But this benefit is theoretical, speculative, and unrealized, plaintiffs say. They received a benefit that flowed from the Terms: genetic analysis conducted by Ancestry. This benefit is limited, plaintiffs submit, like the small benefit the plaintiff received in *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054 (7th Cir. 2018). There is no direct benefit here, plaintiffs argue, because there is no allegation that they have ever viewed this genetic analysis. So, they urge us to affirm the district court's conclusion that "theoretical access to Defendant's services" was not enough to bind Plaintiffs to Ancestry's terms.

Authority applying direct benefits estoppel under Illinois law is scarce. The Supreme Court of Illinois has not directly addressed the topic. And neither *Snyder v. Jack Schmitt Ford*,

*Inc.*, No. 5-21-0413, 2022 WL 1197374 (Ill. App. Ct. 2022), nor *Peterson v. Devita*, No. 1-23-0356, 2023 WL 6166964 (Ill. App. Ct. 2023), applied direct benefits estoppel to bind a non-signatory to a contract. This absence of authority counsels us that Illinois would not embrace direct benefits estoppel to bind plaintiffs here.

> *i.* A.D., *not* Everett, *governs and instructs that direct benefits estoppel does not apply.*

Under direct benefits estoppel, "[a] nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Zurich Am. Ins. Co.*, 417 F.3d at 688; *A.D.*, 885 F.3d at 1064. The benefit accruing to the non-signatory "must flow directly from the agreement." *Everett*, 771 F.3d at 383. "Thus, a benefit derived from the agreement itself is direct. However, a benefit derived from the exploitation of the contractual relationship of parties to an agreement, but not the agreement itself, is indirect." *Id.* at 383–84.

*Everett* concerned "whether an owner-operator of a franchise is obligated to arbitrate under a franchise agreement because she received direct benefits from the agreement despite not having signed the document." 771 F.3d at 381–82. The plaintiff's husband and his company, EA Green Bay, LLC ("EAGB"), entered into a franchise agreement containing an arbitration clause with defendant PDRI. *Id.* at 382. Ms. Everett, the plaintiff, held a 50% ownership stake in EAGB, but did not sign the franchise agreement. *Id.* When PDRI terminated the franchise agreement, Mr. Everett transferred 45 percent of his ownership interest to Ms. Everett, who continued to operate EAGB under the name Building Werks—all while serving the same customers, at the same location, employing the same

people, and trading upon the goodwill and reputation gar-
nered while a PDRI franchise. *Id.* at 382–83.

When PDRI discovered this, it sought to compel
arbitration. *Id.* at 383. Ms. Everett filed suit, seeking a
declaratory judgment that she was not bound to arbitrate as a
non-signatory to the franchise agreement. *Id.*at 383. At first,
the district court denied Ms. Everett's attempt to avoid
arbitration. But, when PDRI returned to the district court to
request confirmation of the arbitration award, Ms. Everett
moved to vacate the award. *Id.* The district court agreed and
reversed its earlier determination, finding that any benefit
Ms. Everett received from the franchise agreement was
"indirect because it flowed through her ownership interest in
EAGB and her relationship to Mr. Everett, but not to her
directly." *Id.*

This court reversed. *Id.* at 385. "Ms. Everett was not merely
exploiting the contractual relationship among EAGB, Mr. Ev-
erett, and PDRI, but rather the benefit of the contract itself—
namely owning and operating a PDRI franchise." *Id.* at 384.
Ms. Everett received the same benefits as her husband, "in-
clud[ing] benefitting from trading upon the name, goodwill,
reputation and other direct contractual benefits of the fran-
chise agreement." *Id.* This court further recognized that
"[w]ithout the franchise agreement, EAGB and the business it
operated would not have existed, and thus Ms. Everett's own-
ership interest would not have existed." *Id.* at 385. Thus, "Ms.
Everett's ownership interest in EAGB was itself a direct ben-
efit of the agreement, and not a separate relationship that the
benefits of the agreement flowed through." *Id.*

In sum, Ms. Everett received direct benefits from the fran-
chise agreement to which she was a non-signatory: power,

control, and direction of the franchise as well as economic benefits derived from the company' prior affiliation with PDRI. These were not potential benefits; Ms. Everett held and wielded these benefits.

Here, the benefit plaintiffs received is not as direct as the benefit in *Everett*.[6] As the district court recognized, the benefit to plaintiffs is "potential" or "inchoate." Plaintiffs have theoretical access to Ancestry's services, but there are no allegations that they have accessed Ancestry's analysis of their DNA. And, as we noted above in our discussion of Ancestry's third-party beneficiary argument, the Terms do not suggest they benefit anyone other than the signatory and Ancestry.

*A.D.* is closer to this case. It concerned a minor's putative class action against Credit One for alleged violations of the Telephone Consumer Protection Act. 885 F.3d at 1057. A.D. sought compensation for telephone calls made by Credit One to her telephone number in attempts to collect a debt A.D. did not owe. *Id.* The debt was her mother's, and Credit One's caller ID capture system had added A.D.'s phone number when her mother used A.D.'s phone to access her account. *Id.* at 1058. Importantly, the standard cardholder agreement between Credit One and A.D.'s mother contained an arbitration clause and a class action waiver. *Id.*

---

[6] *Everett* was a diversity case applying Wisconsin, not Illinois, law. Its discussion and application of direct benefits estoppel cites approvingly to precedent of this court, the Second Circuit, and the Fifth Circuit, none of which relied on Illinois law to resolve the question. *See Zurich Am. Ins. Co.*, 417 F.3d at 688; *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 778–80 (2d Cir. 1995); *Blaustein v. Huete*, 449 F. App'x 347, 350–51 (5th Cir. 2011).

In concluding that A.D. was not bound by the arbitration clause, this court examined whether A.D. could be estopped as a direct beneficiary of the cardholder agreement under Nevada law. *Id.* at 1064. Credit One asserted A.D. "directly benefitted under the cardholder agreement because [A.D.'s mother] asked her to make purchases with the card," and therefore received the same benefit her mother received: "the ability to use the credit card to make purchases." *Id.* We disagreed, as the only benefit received with respect to the credit card "was limited to following her mother's directions to pick up the smoothies that her mother had ordered previously." *Id.* We concluded that estoppel did not apply to bind A.D. to arbitration because "A.D. had no relationship, contractual or otherwise with Credit One." *Id.*

The benefit plaintiffs received here is more direct than the benefit in *A.D.*, which was completely indirect. All A.D. received from her mother's cardholder agreement was the ability to obtain products purchased with her mother's card and under her mother's direction. Here, Ancestry processed each plaintiff's DNA and prepared analyses based on each plaintiff's unique genetic profile. These analyses were available to plaintiffs—through their guardians—if they chose to access them.

But this benefit is still too indirect. As plaintiffs point out, and Ancestry does not contest, there are no allegations suggesting the plaintiffs even accessed their genetic analyses. This makes the benefit similar to the benefit in *A.D.*, and, as noted above, dissimilar to the benefit in *Everett*. Ancestry has not offered any Illinois (or other) authority to support the application of estoppel where a non-signatory has access to a benefit but there are no allegations or evidence that she has in

fact accessed it. Therefore, we agree with plaintiffs that the benefit is too speculative and unrealized to trigger estoppel under Illinois law.

> ii.   *Recent Illinois appellate court decisions confirm this reading.*

Two more recent Illinois cases show the uphill climb Ancestry faces for relief under Illinois law.

In *Snyder*, the plaintiff purchased a truck from Jack Schmitt Ford, executing an Installment Loan Contract containing an arbitration clause. 2022 WL 1197374, at *1. Things devolved from there: Jack Schmitt Ford filed a complaint against Snyder with an arbitrator, and Snyder and his wife filed a 17-count complaint in Illinois state court asserting several tort claims. *Id.* Jack Schmitt Ford sought to compel arbitration, and the trial court agreed to compel arbitration of Snyder's claims, but not his wife's claims, based on her non-signatory status. *Id.* at *2.

On its cross-appeal, Jack Schmitt Ford argued that estoppel principles, including direct benefits estoppel, bound Snyder's wife to the Loan Contract and its arbitration clause. *Id.* at *6–*10. The appellate court rejected this argument. *Id.* The court recognized that courts (albeit not in Illinois) have approved a theory of direct benefits estoppel where the non-signatory requested enforcement of the underlying contract itself. *Id.* at *8–*9 (discussing *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir. 2000) and *In re Weekley Homes, L.P.*, 180 S.W.3d 127 (Tex. 2005)). And Jack Schmitt Ford could not show that Snyder's wife was requesting any enforcement of the contract at issue, as her claims sounded in tort based on allegedly false statements made to her husband's employer. *Id.* at *8.

The Illinois Appellate Court also noted that a direct benefit is "one contained within the provisions of the contract," i.e., "one flowing directly from the agreement." *Id.* at *8, *9. Examining the relevant documents, the court located "nothing in the [Loan Contract that] provides [Snyder's wife] with any direct benefit." *Id.* at *9. In fact, the court considered the connection between any benefit Snyder's wife received and the Loan Contract "even more nebulous" than the connection offered in *A.D. Id.* And much like A.D.'s benefit—the ability to consume goods purchased with her mother's credit card—Snyder's wife derived a benefit "solely from her relationship with [Snyder]." *Id.* at *10. Her use of his vehicle depended totally on him, not any right provided by the Loan Contract. *Id.*

The second case, *Peterson*, concerned an arbitration agreement included in Airbnb's terms of service. 2023 WL 6166964, at *1. The plaintiff was injured when a deck railing gave way at a home booked by his friend through Airbnb. *Id.* at *2. Peterson had an Airbnb account, so Airbnb argued he had previously agreed to its terms. *Id.* Peterson's friend had booked the house, however, and Peterson was not listed on the reservation; he was simply attending a party his friend was hosting on the property. *Id.* at *1–*2. The trial court refused to compel arbitration. *Id.* at *1.

Airbnb appealed and argued that direct benefits estoppel prevented Peterson from avoiding arbitration. *Id.* at *7. Airbnb claimed that Peterson's tort claims stemmed from the benefits he received from his friend's booking. *Id.* Relying on *Snyder*, the court rejected this argument. Peterson's negligence claims did not rely on the terms the friend agreed to when booking the property. And other than as an invitee to

the party, the plaintiff did not benefit from his friend's booking. *Id.*

*Snyder* and *Peterson* further persuade us that direct benefits estoppel does not apply here. As in those cases, the plaintiffs here do not seek to enforce the Terms against Ancestry. Rather, they seek to enforce the Illinois Genetic Information Privacy Act against Ancestry. The grounds Illinois courts have recognized that might allow direct benefits estoppel are not present here.

After considering the authorities cited by the parties, those discussed above, and those located in our search, we do not agree with Ancestry that Illinois law binds plaintiffs as direct beneficiaries of the Terms. Of the cases we could locate considering Illinois law, none applied direct benefits estoppel to bind a non-signatory to a contract.

The record before us, without an allegation that plaintiffs have accessed or used the analyses completed by Ancestry as contemplated by the Terms, does not support applying direct benefits estoppel. "Even assuming that [plaintiffs have] benefited" from the Terms, the benefit of unused DNA analyses is "too attenuated and indirect to force arbitration under an estoppel theory." *Zurich Am. Ins.*, 417 F.3d at 688. When coupled with the strong presumption under Illinois law disfavoring the binding of non-signatories to arbitration, we do not conclude that the district court abused its discretion when it declined to apply equitable grounds to compel plaintiffs to arbitrate on the record before it.

A provision in the Terms designating minor children whose guardians activate a DNA test kit on their behalf as Ancestry users or parties to the Terms could lead to a different

result. Even if Ancestry's future Terms include such language, the Terms here do not.[7] The limits of Illinois law cannot be stretched to make up for that omission.

*       *       *

For the reasons above, we AFFIRM the district court's denial of Ancestry's motion to compel arbitration.

---

[7] Plaintiffs have argued that the lack of such a provision makes this an easier case than *A.D.* Oral Arg. 21:35–22:10. In *A.D.*, the cardholder agreement detailed how someone could become an authorized user, binding them to that agreement's terms (though it was undisputed that neither A.D. nor Credit One followed any step of that procedure). 885 F.3d at 1060–61. As plaintiffs argued, the Terms here do not contain any such provision by which a non-signatory becomes an Ancestry "User" bound to the Terms. *Id*. at 22:10–22:20.