In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 12-3407 & 13-1036

RENEE EVERETT and BUILDING WERKS OF WI, LLC,

*Plaintiffs-Appellees*,

*v.*

PAUL DAVIS RESTORATION, INC.,

*Defendant-Appellant*.

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 1:10–CV–00634–WCG — **William C. Griesbach**, *Chief Judge*.

ARGUED APRIL 10, 2014 — DECIDED NOVEMBER 3, 2014

Before CUDAHY and EASTERBROOK, *Circuit Judges*, and
LAWRENCE, *District Judge*.[*]

CUDAHY, *Circuit Judge*. In the case before us we must de-
termine whether an owner-operator of a franchise is obligat-
ed to arbitrate under a franchise agreement because she re-
ceived direct benefits from the agreement despite not having

[*] Of the Southern District of Indiana, sitting by designation.

signed the document. Paul Davis Restoration, Inc. (PDRI) seeks to bind Renee Everett to an arbitration award pursuant to the franchise agreement PDRI had with her husband and the Everetts' corporation. Although Ms. Everett was a non-signatory to the franchise agreement, PDRI asserted she was subject to arbitration under the doctrine of direct benefits estoppel, among other theories. The district court ultimately determined that the benefits Ms. Everett received were filtered through her ownership interest in their corporation or through her husband and were therefore indirect. Because the facts before us indicate that Ms. Everett did receive a direct benefit from the franchise agreement and can therefore be held to the agreement, we now reverse.

PDRI entered into a franchise agreement with Matthew Everett and EA Green Bay, LLC (EAGB). Prior to PDRI's termination of the franchise agreement, EAGB operated and conducted franchise business under the d/b/a name "Paul Davis Restoration of Northeast Wisconsin" (the franchise). EAGB was owned, controlled, and operated by Mr. Everett, but the evidence clearly shows it was also owned, controlled, and operated by Ms. Everett.

Effective September 1, 2004, Mr. Everett and EAGB entered into the Franchise agreement with PDRI. PDRI's franchise agreements require the Principal Owners of the franchise to form a corporate entity to operate the franchise business. To comply with this requirement Mr. Everett formed EAGB in 2004. There is no dispute that Mr. Everett formed EAGB solely to comply with the PDRI franchise requirement. The franchise agreement also required that EAGB not be used to conduct any business other than operating the PDRI franchise business. Thus, it is clear that EAGB

was formed to gain the benefit of the franchise agreement and was used only to conduct the business of the franchise.

Mr. Everett originally executed the agreement on behalf of EAGB as the franchisee company and individually in his own capacity as the 100% principal owner of EAGB. Despite Mr. Everett signing as the 100% principal owner of EAGB the record shows that Ms. Everett had a 50% ownership of EAGB potentially as early as June 11, 2004 and at the latest by 2008. Regardless of when Ms. Everett became a partial owner, the franchise agreement very clearly stated that the Everetts were required to obtain PDRI's consent before transferring ownership. The terms of the franchise agreement also clearly required that Ms. Everett sign the franchise agreement in her personal capacity as an additional principal owner. The Everetts never requested consent and never had Ms. Everett sign the contract despite their knowledge of these requirements in the agreement. Ms. Everett also played an active role in running EAGB, holding herself out as the Executive Vice President of the franchise and attending PDRI franchise meetings as the representative of the franchise.

In 2010 the franchise agreement was terminated by PDRI for cause. After termination a clause in the franchise agreement prohibited EAGB and the Everetts (as principal owners) from competing with PDRI for two years. Mr. Everett then transferred his 50% ownership of EAGB to Ms. Everett, to whom he gave 45%, and the remaining 5% to an EAGB employee. Rather than abiding by the non-compete clause, Ms. Everett, who now owned 95% of EAGB, continued to operate EAGB under the new d/b/a name Building Werks. Building Werks served the same customers from the same

business location, employed the same people, and traded upon the goodwill and reputation built under the PDRI banner. Ms. Everett even emailed customers from a PDRI marketing list with the subject line: "Same Great Service Under a New Name!" The Everetts seemingly colluded to avoid the post-termination restrictive covenant by simply taking down the PDRI sign and removing Mr. Everett as a principal owner.

PDRI responded by initiating arbitration. Ms. Everett then filed suit seeking a declaratory judgment that she was not bound to arbitrate because she did not sign the franchise agreement. The district court initially denied the preliminary injunction finding "abundant evidence" that she was bound by the franchise agreement under the direct benefits doctrine and that there was a scheme between the Everetts to try to avoid the non-compete provisions. Thus, the arbitration continued and the panel entered a unanimous award against Ms. Everett.

PDRI returned to the district court and requested confirmation of the arbitration award and Ms. Everett simultaneously moved to vacate the award. Despite there being no change in the undisputed facts and evidence before the court and no intervening change in the law, the district court reversed itself, holding that Ms. Everett did not directly benefit from the franchise and was thus not bound by the arbitration clause. The district court vacated the arbitration award, finding the benefit to Ms. Everett to be indirect because it flowed through her ownership interest in EAGB and her relationship to Mr. Everett, but not to her directly. PDRI appeals. We review the district court's decision to vacate the arbitration award *de novo*. *Webster v. A.T. Kearney, Inc.*, 507

F.3d 568, 571 (7th Cir. 2007); *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 687 (7th Cir. 2005).

## I.

The primary question before us is whether Ms. Everett is bound to the arbitration award, pursuant to the franchise agreement. Typically, the fact that Ms. Everett never signed the franchise agreement would be the end of our discussion. However, the obligation to arbitrate a dispute is not always limited to those who have personally signed an agreement containing such a provision. *See e.g.*, *Thomson-CSF v. American Arbitration Association*, 64 F.3d 773, 776 (2d Cir. 1995) ("This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" (citing *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980))). We have previously recognized a number of theories binding non-signatories to arbitrate, including the doctrine of direct benefits estoppel. *Zurich Am. Ins. Co.*, 417 F.3d at 687.

Our initial task is to determine whether Renee Everett received a direct benefit from the franchise agreement or whether, as the district court found, some aspect of Ms. Everett's relationship to the franchise or her husband made any benefit she received indirect. Under the doctrine of direct benefits estoppel, a non-signatory party is estopped from avoiding arbitration if she "knowingly seeks the benefits of the contract containing the arbitration clause." *Id.* at 688. As the name suggests, in order to trigger the doctrine the benefit received by the non-signatory must flow directly from the agreement. *Id.*; *MAG Portfolio Consult., GmbH v. Merlin Biomed Group, LLC*, 268 F.3d 58, 61 (2d Cir. 2001). Thus, a benefit

derived from the agreement itself is direct. However, a bene-
fit derived from the exploitation of the contractual relation-
ship of parties to an agreement, but not the agreement itself
is indirect. *MAG Portfolio*, 268 F.3d at 61.

Initially, the district court reached the conclusion that
there was "abundant evidence" that Ms. Everett directly
benefited from the franchise agreement signed by her hus-
band. The court took particular note of the collusion be-
tween the Everetts to avoid the restrictive covenant in the
Franchise Agreement and the fact that EAGB was a family
owned business, which Ms. Everett both ran and profited
from. However, when considering whether to approve the
arbitration award in PDRI's favor, the district court was "no
longer convinced" it had used a "correct application of direct
benefits estoppel." PDRI asserted that Ms. Everett received
direct economic benefits that would not have existed but for
the franchise agreement and that her new business, Building
Werks, would not exist if not for her secret ownership and
operation of the PDRI franchise. While conceding this was
all true, the district court concluded that PDRI did not show
that "she benefitted directly from the contract" but instead
from "the business that the contract made profitable." The
district court thus determined that all benefits Ms. Everett
received were filtered through the business and her hus-
band, making them indirect benefits.

There is a relative dearth of precedent regarding direct
benefits estoppel, and consequently the district court primar-
ily relied on a handful of Second Circuit cases to flesh out
the distinction between direct and indirect benefits. To illus-
trate indirect benefits, the district court relied upon *Thomp-
son-CSF v. American Arbitration Association*, 64 F.3d 773 (2d

Cir. 1995). In *Thompson* two companies agreed to trade exclusively with each other. *Id.* at 775. A third party competitor obtained one of the companies with the intent of squeezing the other company out of business. *Id.* at 776. The unacquired signatory was now contractually bound to trade only with the subsidiary of its competitor, and the third party competitor then exploited the trade contract and refused to trade with the other company. *Id.* While the trade agreement was crucial to the benefit the third party obtained by shutting down its competition, the agreement was not the direct source of the benefit; rather the source of the benefit was the third party's ability to exploit the contractual relationship. *Id.* at 779.

Analogizing *Thompson* to the facts of this case, the district court found that the Ms. Everett only "exploited, or benefitted from, the contractual relationship her husband and EAGB had with PDRI. EAGB presumably was profitable because of the PDRI franchise." In other words the court determined that as Mr. Everett's spouse and co-owner she had a right to share the profits of the franchise, but that the benefits were indirect since they derived through her husband and the corporation. We find this to be too narrow an interpretation of direct benefits estoppel. Instead we find that Ms. Everett was not merely exploiting the contractual relationship among EAGB, Mr. Everett and PDRI, but rather the benefit of the contract itself—namely owning and operating a PDRI franchise. Ms. Everett received the same benefits as her husband, which included benefitting from trading upon the name, goodwill, reputation and other direct contractual benefits of the franchise agreement.

There is also something to be said for the fact that Mr. and Ms. Everett colluded to avoid the franchise agreement in order to leave Ms. Everett free from the contractual obligations contained in it. Yet, Ms. Everett received precisely the same key benefits that Mr. Everett did. In that regard, this case is not analogous to *Thompson*, where a third party took advantage of an existing contractual relationship, 64 F.3d at 779, because here the Everetts sought to obtain the benefits of the franchise agreement for both Mr. and Ms. Everett, while still being able to avoid some of the obligations by misrepresenting Ms. Everett's ownership and operating interest in EAGB.

Thus, the district court's finding that "whatever benefit Ms. Everett derived from the franchise agreement was filtered through her ownership interest in EAGB and would therefore be considered indirect" is inappropriate. It is clear from the record that EAGB existed solely because of the franchise agreement. PDRI required that Mr. Everett create EAGB to qualify for the franchise agreement and further stipulated that EAGB could only be used to run the franchise. To say the benefits of the franchise were indirect by flowing first to EAGB and then to Ms. Everett is a flawed interpretation of the doctrine of direct benefits estoppel. Ms. Everett's ownership interest in EAGB was itself a direct benefit of the agreement, and not a separate relationship that the benefits of the agreement flowed through. Without the franchise agreement EAGB and the business it operated would not have existed, and thus Ms. Everett's ownership interest would not have existed.

In fact, if we extended the district court's interpretation to its logical end direct benefits estoppel would never be

available against a non-signatory if at least one signatory existed with an ownership interest, because the benefits of the agreement can always be said to flow through that signatory. We do not think this interpretation is in accord with the Second Circuit cases.

The only way the benefits flowing to Ms. Everett could have been more direct would be if she had signed the agreement as a principal owner, as she was in fact obligated to do under the agreement. She was a majority owner actively involved in operating the franchise and has continued to benefit from the goodwill towards the PDRI franchise while running her new company. We are not persuaded that Ms. Everett's ability to own and operate a successful franchise was somehow an indirect benefit of the franchise agreement merely because it was done through an LLC. Relying on corporate formalities to argue that an ownership interest somehow dilutes the benefits of a franchise agreement is not persuasive in this case. Rather, as PDRI asserts, ownership of EAGB was itself a direct benefit of the contract. *See Blaustein v. Huete*, 449 Fed. Appx. 347, 350 (5th Cir. 2011) (holding that a member of an LLC was obligated to arbitrate because he had formed the LLC for the purpose of the contractual relationships and received the same benefits under the contract).

## II.

PDRI also asserted the doctrine of assumption; however, the application of the direct benefits estoppel doctrine disposes of the issue, making it unnecessary for us to pass on the less well-developed assumption arguments.

### III.

Finally, Ms. Everett asserts a number of other reasons why the arbitration award should not be enforced. The district court did not address any of these issues, but because they are legal issues that can be easily disposed of, we will address them now.

First, Ms. Everett asserts that the Wisconsin Fair Dealership Law (WDFL) invalidates the arbitration clause in its entirety, leaving the franchise agreement without *any* arbitration clause. The franchise agreement did incorporate Wisconsin law by amendment to the agreement, and specifically adopted the protections of the WDFL. As a result, there is no doubt that the WDFL governs any arbitration arising from the agreement. However, this does not mean, as Ms. Everett argues, that the arbitration clause is automatically invalidated by the incorporation of the WDFL. Instead, the arbitration process, as PDRI concedes, is governed by the protections of the WDFL. Ms. Everett ultimately provides no support for her contention that the WDFL invalidates arbitration agreements that explicitly adopt the protections of the WDFL. In fact, the one case that Ms. Everett does cite in support of her argument has nothing to do with the WDFL's impact on an arbitration clause. *See White Hen Pantry v. Buttke*, 301 N.W.2d 316 (Wis. 1981). As a result, we reject Ms. Everett's argument that the WDFL wholly invalidates the arbitration clause.

Ms. Everett further argues that the arbitration clause was unconscionable. This argument is frivolous. This agreement is not the typical consumer contract involving a highly sophisticated party and one without sophistication. Instead, the terms of the agreement here were negotiated by two sophisticated parties. To suggest, as Ms. Everett does, that the

power balance between PDRI and Mr. Everett, an experienced businessman, were so one-sided so as to deprive Mr. Everett of any meaningful choice, or that the terms were so unreasonable as to be outside any notion of normal commercial relations is to misunderstand the doctrine of unconscionability. *See e.g.*, *Wis. Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 164 (Wis. 2006); *Coady v. Cross Country Bank*, 729 N.W.2d 732, 742 (Wis. App. Ct. 2007). We thus reject Ms. Everett's unconscionability argument.

Ms. Everett also alleges that the arbitration agreement violated Ms. Everett's due process rights. We find this argument wholly unavailing, as this argument fails at the most basic level—none of the parties involved are state actors.[1] *See e.g.*, *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186, 1191 (11th Cir. 1995) ("We agree with numerous courts that have held that the state action element of a due process claim is absent in private arbitration cases.").

Finally, Ms. Everett argues that the district court should have vacated the arbitration award on the basis that the arbitration panel both exceeded its powers and exhibited bias favoring PDRI. Addressing the scope of the panel's power first, Ms. Everett's argument fails due to the limited nature of our review of arbitration awards. Under Wisconsin law, Ms. Everett begins, "courts will vacate an award when arbitrators exceeded their power though 'perverse misconstruction,' positive misconduct, a manifest disregard of the law, or when the award is illegal or in violation of a strong public

---

[1] We note that in support of this argument, Ms. Everett cites *Shelley v. Kraemer*, 334 U.S. 1 (1948), which on its face provides a very close analogy for this situation. However, *Shelley*'s holding has never been applied outside the context of race discrimination. *See Davis*, 59 F.3d at 1191.

policy." Appellees' Br. at 35–36 (citing *Baldwin-Woodville Area School Dist. v. West Cent. Educ. Association-Baldwin Woodville Unit*, 317 Wis.2d 691, 701 (Wis. 2009)). While Ms. Everett correctly states the law regarding vacatur of arbitration awards, she incorrectly applies it to the conduct she complains of—none of which rises to the level of egregious misconduct that justifies vacatur. Instead, Ms. Everett's allegations speak of certain errors made by the arbitration panel, which are unreviewable. *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008) ("Factual or legal error, no matter how gross, is insufficient to support overturning an arbitration award.").

We also find that Ms. Everett's claim of bias fails. She seems to base this claim on two factors: first that the structure of the panel exhibited bias because it was made up of PDRI franchise owners, and second that ex parte communications between the parties and members of the arbitration panel prejudiced the proceedings. Regarding the unfairness of the peer-franchisee arbitration system, the arrangement was fully disclosed to Mr. Everett and these types of arbitration panels have repeatedly been upheld. *See e.g.*, *Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 428–29 (7th Cir. 1996) (holding that evidence of bias must show that the "arbitrators had a personal stake in the outcome of the arbitration," simply showing a financial relationship between arbitrators and a party is not sufficient). Similarly, Ms. Everett has failed to show that the ex parte communications between the arbitrators and the parties prejudiced the proceedings in any way. Non-prejudicial ex parte communications are not a basis for vacatur. *Drobny v. C.I.R.*, 113 F.3d 670, 680–81 (finding that "innocuous communication" was not prejudicial and therefore not an impermissible ex parte communication).

For the foregoing reasons the judgment is REVERSED and REMANDED.