# United States Court of Appeals
## For the First Circuit

No. 25-1254

ABDULKADIR ABDISALAM,
individually and for all others similarly situated,

Plaintiff, Appellee,

v.

STRATEGIC DELIVERY SOLUTIONS, LLC,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Kayatta and Rikelman, Circuit Judges.

James A. Eckhart, with whom Andrew J. Butcher and Scopelitis,
Garvin, Light, Hanson & Feary, P.C. were on brief, for appellant.

Brant Casavant, with whom Brook Lane and Fair Work P.C. were
on brief, for appellee.

March 17, 2026

**RIKELMAN, <u>Circuit Judge</u>**. For several years, Abdulkadir Abdisalam provided courier services for Strategic Delivery Solutions, LLC ("SDS"), a healthcare delivery company. Eventually, he sued SDS, alleging that it misclassified its couriers as independent contractors and failed to pay them appropriate wages, all in violation of Massachusetts law. In response, SDS filed a motion to stay the case and compel arbitration of Abdisalam's claims. SDS pointed to an arbitration provision in an agreement between it and Abdul Courier, LLC, a corporation that SDS had required Abdisalam to form in order to provide it with courier services. The district court determined that Abdisalam was not a signatory to that agreement and could not be bound by its arbitration provision as a matter of contract law or under principles of equitable estoppel; it then denied SDS's motion. We agree with the district court's ruling and thus affirm.

## I. BACKGROUND

### A. Relevant Facts

SDS transports medication and medical supplies for pharmacies, hospitals, and laboratories and operates in several states, including Massachusetts.[1] To provide these healthcare delivery services, SDS retains individuals to act as couriers.

---

[1] We draw the relevant facts from the operative complaint and the parties' submissions related to SDS's motion to compel arbitration. <u>See</u> <u>Cullinane</u> v. <u>Uber Techs., Inc.</u>, 893 F.3d 53, 55 (1st Cir. 2018).

But SDS does not hire the couriers directly; instead, it requires prospective couriers to form "their own corporations" and then contracts with those corporations to provide courier services for SDS. SDS classifies its couriers as independent contractors, rather than employees.

Consistent with its usual practice, SDS required Abdisalam to form his own corporation before he could provide deliveries for the company.[2] So, Abdisalam created Abdul Courier, LLC, which he registered with the Secretary of the Commonwealth of Massachusetts.

Abdul Courier, LLC and SDS entered into an Independent Vendor Agreement for Transportation Services (the "Vendor Agreement") in April 2019. The Vendor Agreement is a form contract that SDS prepared; neither Abdul Courier, LLC nor Abdisalam drafted or negotiated any portion of it. Abdisalam signed the Vendor Agreement as the "Owner" of Abdul Courier, LLC.

In its first sentence, the Vendor Agreement states that it was "entered into . . . by and between ABDUL COURIER LLC . . . (the 'Vendor') and Strategic Delivery Solutions, LLC . . . ('SDS')." The agreement sets out that Abdul Courier,

_____

[2] To the extent SDS disputes Abdisalam's affidavit testimony that SDS required him to form his own corporation, we construe that fact in the light most favorable to Abdisalam as the party opposing the motion to compel arbitration. See Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 175 (1st Cir. 2021).

- 3 -

LLC has agreed to provide courier services for SDS. It also includes an arbitration provision, which indicates, in relevant part:

> The parties agree to comply and be bound by The Federal Arbitration Act. The parties agree that any dispute, difference, question, or claim arising out of or in any way relating to this Agreement or the transportation services provided hereunder shall be subject to binding arbitration in accordance with the Rules for Commercial Arbitration of the American Arbitration Association . . . in effect at the time such arbitration is initiated. The parties agree that the issue of arbitrability shall be determined by the arbitrator applying the law of the state of residence of the Vendor.

Under Section 19 of the Vendor Agreement, the "Governing Law" provision, the entire agreement must be interpreted based on the law of the Vendor's state of residence. The parties agree that Massachusetts law applies per this provision.[3]

Abdisalam started performing courier services for SDS in May 2019. Typically, he worked fourteen to sixteen hours per day, five or six days per week. He used his personal vehicle to deliver prescription medication and other medical supplies. According to Abdisalam, SDS has not reimbursed him for transportation costs

---

[3] Abdul Courier, LLC was a Massachusetts business formed by a Massachusetts resident, Abdisalam, so there is no dispute that Massachusetts law governs the Vendor Agreement. See BRT Mgmt. LLC v. Malden Storage LLC, 68 F.4th 691, 696 (1st Cir. 2023) (finding that an LLC was a citizen of Massachusetts for diversity purposes "because its sole member [was] a natural person who [was] a resident of Massachusetts").

that he incurred in connection with his courier work, including fuel, tolls, maintenance, insurance, or mileage on his personal vehicle.

The Secretary of the Commonwealth of Massachusetts involuntarily dissolved Abdul Courier, LLC at the end of 2023.[4] Nevertheless, Abdisalam continued performing deliveries for SDS through October 2024.

## B. Procedural History

In July 2024, Abdisalam filed this lawsuit against SDS in the Massachusetts Superior Court, alleging violations of two Massachusetts statutes: the Massachusetts independent contractor statute, Mass. Gen. Laws ch. 149, § 148B, and the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148. He sought multiple forms of relief, including a declaratory judgment that SDS's couriers are, as a matter of law, employees, not independent contractors; restitution of "all unpaid wages, including for all improper deductions taken from the medical couriers' wages"; and restitution "at the annual IRS reimbursement rate for all miles driven in connection with [the couriers'] work for SDS." Abdisalam sued on his own behalf and on behalf of a putative class of similarly situated couriers.

---

[4] The parties have not pointed to anything in the record that indicates the reason for the involuntary dissolution.

SDS removed the case to federal court based on diversity jurisdiction. See 28 U.S.C. §§ 1332, 1441(a). It then filed a motion to compel arbitration and stay the case. The district court denied SDS's motion, concluding that Abdisalam was not a signatory to the Vendor Agreement and thus could not be bound by its arbitration provision as a matter of contract law. It also rejected SDS's argument that Abdisalam could be required to arbitrate as a nonsignatory under various estoppel theories.

SDS timely appealed.

## II. STANDARD OF REVIEW

We review de novo the district court's denial of a motion to compel arbitration. See Morales-Posada v. Cultural Care, Inc., 141 F.4th 301, 307 (1st Cir. 2025). We may affirm the court's order "on any independent ground made manifest by the record." Barbosa v. Midland Credit Mgmt., Inc., 981 F.3d 82, 86 (1st Cir. 2020) (quoting Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 78 (1st Cir. 2018)).

## III. DISCUSSION

The parties' dispute focuses on three central questions. First, who should have decided whether Abdisalam was bound by the Vendor Agreement's arbitration provision: the district court or an arbitrator? Second, assuming that the district court should have decided the first question, did the court correctly determine that Abdisalam did not sign the Vendor Agreement in his personal

- 6 -

capacity, and thus was not bound by its arbitration provision? And third, even if Abdisalam did not sign the Vendor Agreement in his personal capacity, could SDS nevertheless compel him to arbitrate his claims based on various theories of equitable estoppel? We conclude that the district court correctly resolved all these issues in Abdisalam's favor.

In conducting our review, we focus on the Vendor Agreement, which we must interpret based on Massachusetts law under its "Governing Law" provision. "As a federal court sitting in diversity jurisdiction, . . . 'we endeavor to predict how the Commonwealth's highest court would' rule on the" state-law issues presented. Blakesley v. Marcus, 158 F.4th 90, 95 (1st Cir. 2025) (quoting Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024)). In doing so, we bear in mind that we "are not free to extend the reach of state law." Doe v. Trs. of Bos. Coll., 942 F.3d 527, 535 (1st Cir. 2019).

## A. The Question of Arbitrability

Under the Federal Arbitration Act, which was incorporated into the Vendor Agreement's arbitration provision, courts must "treat arbitration as 'a matter of contract' and enforce agreements to arbitrate 'according to their terms.'" Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 174 (1st Cir. 2021) (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 67 (2019)). In seeking to compel

Abdisalam to arbitrate his claims, SDS had the burden to establish "that a valid agreement to arbitrate exist[ed]" between it and Abdisalam.  Id. (quoting Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011)).  "Courts apply state contract law to determine whether a valid arbitration agreement exists."  Id.

As we previewed above, the Vendor Agreement is governed by Massachusetts law.  And under Massachusetts law, "[t]he question [of] whether [Abdisalam] is bound by the arbitration agreement between [SDS and Abdul Courier, LLC] is a 'gateway dispute' that [is] an issue for the court, and not the arbitrator, to decide in the first instance."  Walker v. Collyer, 9 N.E.3d 854, 859-60 (Mass. App. Ct. 2014) (quoting Mass. Highway Dep't v. Perini Corp., 828 N.E.2d 34, 41 (Mass. 2005)).  Indeed, given that Abdisalam "attacks the very existence of an agreement" between him and SDS, "a court must resolve the question of arbitrability."  Id. at 860 (quoting DK Joint Venture 1 v. Weyand, 649 F.3d 310, 317 (5th Cir. 2011)).  The district court was therefore correct to rule that it was obligated to decide this "gateway dispute."

SDS resists this conclusion, pointing to language in the Vendor Agreement's arbitration provision indicating that arbitrability issues should be decided by an arbitrator (the so-called "delegation clause").  But in making this argument, SDS

- 8 -

begs the critical question of whether Abdisalam is bound by the Vendor Agreement at all.

Notably, the arbitration provision in the Vendor Agreement, including its delegation clause, applies only to "the parties" to that agreement. And, under Massachusetts law, because Abdisalam contends that he was not a party to the Vendor Agreement, it was up to the court, not an arbitrator, to resolve this threshold dispute. See id.; see also Morales-Posada, 141 F.4th at 309 (rejecting a nonsignatory defendant's "request that we enforce the delegation agreement in the [contract at issue]" because it "[was] not a request that we 'respect the parties' decision as embodied in the contract'" (quoting Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 27 (1st Cir. 2021))).

SDS's arguments to the contrary are not persuasive. The cases it cites do not support its claim that a nonsignatory to a contract can be hauled into arbitration merely because the parties to that contract agreed to an arbitration provision with a delegation clause. Indeed, as with several of its arguments on appeal, SDS overlooks the legal distinction between a nonsignatory voluntarily opting into arbitration by invoking an arbitration clause against a signatory and the very different situation of a signatory attempting to force a nonsignatory to arbitrate.

For example, SDS points to Arthur Andersen LLP v. Carlisle, 556 U.S. 624 (2009), but that case does not help its

position.  Arthur Andersen stated that the Federal Arbitration Act does not "purport[] to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)."  Id. at 630.  It then held that nonsignatories are not categorically barred from seeking to compel arbitration where "traditional principles of state law allow a contract to be enforced by . . . nonparties to the contract."  Id. at 631 (internal quotation marks omitted).  Thus, Arthur Andersen does not broadly support imposition of a delegation clause against a nonsignatory, at least absent some equitable exception.  And the other cases SDS relies on concern the enforcement of delegation provisions against signatories to an arbitration agreement or else against third-party beneficiaries specifically identified in the underlying agreement.  See, e.g., Apollo Comput., Inc. v. Berg, 886 F.2d 469, 470-73 (1st Cir. 1989) (allowing a nonsignatory who had been assigned a signatory's contractual rights to enforce an arbitration provision against another signatory); Bossé, 992 F.3d at 28-30 (addressing the enforceability of a delegation provision between signatories); Casa Arena Blanca LLC v. Rainwater by Est. of Green, No. 21-2037, 2022 WL 839800, at *3-5 (10th Cir. Mar. 22, 2022) (holding that the delegation provision bound the estate of a third-party beneficiary identified in the relevant agreement).

SDS also suggests that, before the district court, Abdisalam was obligated to challenge the delegation clause itself if he wanted to avoid arbitration. To support this argument, SDS cites Becker v. Delek US Energy, Inc., 39 F.4th 351 (6th Cir. 2022). But again, the party seeking to avoid arbitration in Becker was a signatory to the relevant agreement. See id. at 354-56. And Becker held that "[w]e can decide the question whether the delegation clause is enforceable by a [nonsignatory] only if [the signatory] challenged the enforceability of that clause specifically." Id. at 356 (internal quotation marks omitted). Given that the signatory in Becker was bound by the delegation clause to which it agreed, Becker has little application here, where Abdisalam contends that he never entered into an arbitration agreement with SDS. For that reason, Abdisalam need not have challenged the delegation clause specifically, and SDS remains stuck at the doorstep to arbitration: it must establish that a valid agreement to arbitrate exists between it and Abdisalam.

**B. The Signatories to the Vendor Agreement**

Moving to the substantive question of whether Abdisalam was a party to the Vendor Agreement, SDS relies on two primary arguments in challenging the district court's decision that he was not. It points to Abdisalam's signature as the "Owner" of Abdul Courier, LLC in several places in the agreement, and it highlights that Abdisalam continued to provide courier services even after

Abdul Courier, LLC was dissolved.  We hold that neither of these arguments can prevail given the agreement's text.

As required by Massachusetts law, we start with the plain language of the Vendor Agreement.  See Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc., 106 N.E.3d 572, 577 (Mass. 2018).  The first sentence of the agreement states that it was "entered into . . . by and between ABDUL COURIER LLC . . . (the 'Vendor') and Strategic Delivery Solutions, LLC . . . ('SDS')."  The text of the Vendor Agreement does not refer to Abdisalam by name at all.  Rather, the Vendor Agreement repeatedly refers to the "Vendor" -- that is, Abdul Courier, LLC -- and SDS as "the parties."

To be sure, Abdisalam did sign the Vendor Agreement, but he did so only as the "Owner" of Abdul Courier, LLC and not in his personal capacity.  Under Massachusetts law, "[u]nless otherwise agreed, a person making or purporting to make a contract for a disclosed principal does not become a party to the contract." Marshall v. Stratus Pharms., Inc., 749 N.E.2d 698, 705 (Mass. App. Ct. 2001) (quoting Porshin v. Snider, 212 N.E.2d 216, 217 (Mass. 1965)); see also id. (explaining that the signature of a corporation's president "ma[de] clear that [the president] was contracting on behalf of [the corporation]"); Brennan v. Carvel Corp., 929 F.2d 801, 810 (1st Cir. 1991) (applying Massachusetts law and reversing the district court's entry of judgment against

- 12 -

a corporation's vice president because "there [was] no evidence in the record that the parties intended to make [him] individually liable on the contract" with the defendant).

Further, as Abdisalam points out, the Vendor Agreement specifically distinguishes between the "Vendor" -- that is, Abdul Courier, LLC -- and "Vendor Support Personnel," which includes the "Vendor's officers, directors, agents, subcontractors, substitute drivers, employees, helpers or servants." Presumably, "Vendor Support Personnel" would encompass Abdisalam as the "Owner" of Abdul Courier, LLC. Although certain provisions in the Vendor Agreement reference both the "Vendor" and "Vendor Support Personnel," the arbitration provision does not. It exclusively refers to "[t]he parties," making no mention of "Vendor Support Personnel." Cf. Hogan v. SPAR Grp., Inc., 914 F.3d 34, 41 (1st Cir. 2019) (observing that "the arbitration provision . . . cabin[ed] its scope to disputes 'between the Parties' to the Master Agreement, with the 'Parties' unambiguously defined"). Given the "probable sophistication" of SDS as the drafter of the Vendor Agreement, such an "omission . . . from the arbitration [provision] must be regarded as purposeful." Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc., 795 F.2d 1111, 1118 (1st Cir. 1986).

SDS insists that the text of at least one section of the Vendor Agreement does treat Abdisalam as a signatory in his

personal capacity, pointing to Schedule B, which concerns equipment rental. The first sentence of Schedule B provides: "I, ABDULKADIR MOHAMMED ABDISALAM, an independent vendor, under contract with SDS, elect to rent the equipment specifically identified below from SDS if the customer of SDS requires an electronic signature from the consignee."

But, again, it is clear from the face of Schedule B that Abdisalam is renting the equipment as "an independent vendor" only in his capacity as the "Owner" of Abdul Courier, LLC. In the signature block for Schedule B, Abdul Courier, LLC is listed as the "Vendor" and Abdisalam signed as its "Owner," with the word "Owner" appearing directly below his signature. See Marshall, 749 N.E.2d at 705.

Further, SDS's practice of refusing to contract directly with individual prospective couriers informs our conclusion that Abdisalam is not a signatory to the Vendor Agreement. From the outset, SDS required Abdisalam to establish a corporation so that SDS could contract with Abdul Courier, LLC, as opposed to Abdisalam himself, for delivery services. Thus, SDS's current argument that Abdisalam qualifies as a signatory to that agreement is inconsistent with the contracting arrangement that SDS imposed.

In sum, as the district court concluded, "nothing in the plain text of the [Vendor Agreement] evinces an intent to personally bind [Abdisalam] to its terms and conditions." That

Abdisalam continued to provide delivery services to SDS after Abdul Courier, LLC was dissolved cannot revise the plain text of the Vendor Agreement. Because Abdisalam is not a signatory to the Vendor Agreement, the Vendor Agreement's terms, including its arbitration provision, do not bind him in his personal capacity.

### C. Alternative Estoppel Theories

We now turn to SDS's alternative arguments that it can compel Abdisalam to arbitrate, even as a nonsignatory to the Vendor Agreement. SDS presses three theories in support of its position: (1) direct benefits estoppel, (2) intertwined claims estoppel, and (3) a successor-in-interest theory. According to SDS, each of these theories independently compels Abdisalam to arbitrate his claims. As we explain below, we disagree.

### 1. Direct Benefits Estoppel

Direct benefits estoppel "allows a signatory to compel to arbitration a nonsignatory party receiving a direct benefit from an arbitration agreement." Walker, 9 N.E.3d at 861. Under this estoppel theory, a party "knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." Id. at 861-62 (quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001)). For the direct benefits theory to apply, the nonsignatory must have "knowingly accepted the benefits" of the agreement at issue, and those benefits must

- 15 -

"flow[] directly from the agreement." Id. at 862 (quoting MAG, 268 F.3d at 61). It is not enough if "the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." Id. (quoting MAG, 268 F.3d at 61); see also Ribadeneira v. New Balance Athletics, Inc., 65 F.4th 1, 21 (1st Cir. 2023) (applying Massachusetts law and explaining when the direct benefits theory applies).

The district court determined that "any benefit [Abdisalam] may have received in his personal capacity for performance of the contract was, at best, indirect." SDS has not persuaded us that the district court erred in so concluding.

SDS argues that Abdisalam purportedly reaped numerous direct benefits from the Vendor Agreement. These alleged benefits include: "(1) accepting packages for delivery from SDS; (2) operating under SDS's federal motor carrier authority instead of procuring his own; and (3) procuring certain insurance coverage and capping cargo liability at a discounted rate." According to SDS, these "tangible benefits -- enabling business operations or limited liability -- support equitable estoppel."

But all these purported benefits flowed to Abdul Courier, LLC, at least prior to the LLC's dissolution, not to Abdisalam. By its terms, the Vendor Agreement permitted Abdul Courier, LLC -- not Abdisalam -- to do business with SDS and to

- 16 -

operate under SDS's federal motor carrier authority. And SDS has provided no evidence that Abdisalam procured insurance coverage in his individual capacity instead of on behalf of Abdul Courier, LLC.

Of course, it is undisputed that Abdisalam owned Abdul Courier, LLC. But "limited liability companies are entities that exist separate and distinct from the individuals who own them." Dickey v. Inspectional Servs. Dep't of Bos., 120 N.E.3d 1179, 1181 (Mass. 2019). If ownership of a business entity receiving direct benefits under a contract were enough to establish direct benefits to its owner, then courts have been engaging in superfluous analyses in direct benefits estoppel cases. See, e.g., Ribadeneira, 65 F.4th at 6-7, 26-27 (determining that the controlling owner of a business entity was subject to direct benefits estoppel "[b]ecause he sought to enforce the terms of the . . . [a]greement" in a separate suit, not simply because of his controlling ownership); Cavallaro v. Wilmer Cutler Pickering Hale & Dorr, LLP, No. 1484CV03598BLS1, 2020 WL 2193633, at *1, *4-6 (Mass. Super. Ct. Feb. 3, 2020) (determining that the owners of a business entity were subject to direct benefits estoppel because they relied on the underlying contract to bring claims in their individual capacities and received other direct benefits, not simply because they were owners). And we note, as the district

- 17 -

court did, that SDS makes no argument for piercing the corporate veil of Abdul Courier, LLC.

At oral argument, SDS relied heavily on a decision from the U.S. Court of Appeals for the Seventh Circuit -- Everett v. Paul Davis Restoration, Inc., 771 F.3d 380 (7th Cir. 2014) -- that applied Wisconsin law. According to SDS, Everett stands for the proposition that Abdisalam is a direct beneficiary of the Vendor Agreement as the sole owner of Abdul Courier, LLC and is therefore subject to the Vendor Agreement's arbitration provision.

To be sure, Massachusetts courts have "look[ed] to other jurisdictions" in deciding thorny and novel questions of arbitrability, Walker, 9 N.E.3d at 859, but even so, the facts in Everett are just too different to support SDS's argument here. In Everett, the Seventh Circuit found that the nonsignatory plaintiff, a co-owner of a franchise with her husband, had directly benefited from the franchise agreement that included an arbitration clause. See 771 F.3d at 383-85. The court explained that "[w]ithout the franchise agreement . . . [her] ownership interest would not have existed." Id. at 385. Critically, the franchise agreement had obligated the plaintiff to "sign [it] in her personal capacity as an additional principal owner" of the franchise, but she had steadfastly refused to do so. Id. at 382. The Seventh Circuit also noted that, according to the facts found by the district court, she then colluded with her husband to avoid

the noncompetition requirements in the agreement after the franchisor terminated their franchise. See id. at 382-83. Thus, the Seventh Circuit held, she was estopped from avoiding arbitration. See id. at 385.

We are mindful that "[e]quitable remedies are flexible tools to be applied with the focus on fairness and justice." Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 257 (Mass. 2008) (quoting Demoulas v. Demoulas, 703 N.E.2d 1149, 1169 (Mass. 1998)). In this case, SDS specifically avoided contracting with Abdisalam in his personal capacity and instead signed an agreement with Abdul Courier, LLC. The Seventh Circuit's decision to apply direct benefits estoppel on the very different facts in Everett, which demonstrated that an LLC member had colluded to take advantage of the corporate form so that she could avoid the constraints of a contract, does not point to the same outcome here.

We agree with the district court that, under Massachusetts law, any benefit that Abdisalam received from the Vendor Agreement was, "at best, indirect." That is, the benefit flowed from Abdul Courier, LLC's relationship with SDS, which permitted Abdisalam to act as a courier for the company, not from the Vendor Agreement itself. See Walker, 9 N.E.3d at 862; see also MAG, 268 F.3d at 62 (explaining that, in Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995), "the agreement was not the direct source of the benefit" because "the benefit

- 19 -

flowed from the nonsignatory's exploitation of the contractual relation created through the agreement").

SDS makes one last argument to the contrary, highlighting Abdisalam's continued performance of courier services following the dissolution of Abdul Courier, LLC. According to SDS, once Abdul Courier, LLC dissolved, Abdisalam was the only possible beneficiary of the Vendor Agreement. But SDS failed to develop a record before the district court to support this argument. If SDS were aware of the dissolution, it would be fair to infer that the Vendor Agreement was simply superseded at that point by a new implied-in-fact contract between SDS and Abdisalam established by their course of conduct. In that situation, Abdisalam still would not be reaping any direct benefits from the Vendor Agreement. Simply put, as the party seeking to compel arbitration, SDS has not carried its burden to demonstrate that the dissolution of Abdul Courier, LLC supports its position.

Because Abdisalam neither directly benefited from nor personally embraced the Vendor Agreement while it was in force, SDS cannot rely on direct benefits estoppel to compel him to arbitrate his claims.

### 2. Intertwined Claims Estoppel

Next, we consider SDS's argument that Abdisalam must arbitrate his claims because they are "intertwined" with the Vendor Agreement. The district court rejected this argument as well. It

explained that "it [was] not clear to the court how SDS [could] plausibly maintain that Abdisalam's individual employment-based claims hinge on how his work was classified in a third-party contract to which he was not personally a signatory." Again, we agree with the district court's ruling.

Massachusetts courts primarily apply intertwined claims estoppel to "allow[] a nonsignatory to compel a signatory to arbitrate." Walker, 9 N.E.3d at 861; see also Machado v. System4 LLC, 28 N.E.3d 401, 409 (Mass. 2015) ("When the [plaintiff] signatory's claims against a [defendant] nonsignatory refer to or presume the existence of the written agreement that compels arbitration, the [plaintiff] signatory's claims may be considered to arise out of and be directly intertwined with that agreement, rendering arbitration appropriate."). Similarly, under federal common law, "federal courts generally 'have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" InterGen N.V. v. Grina, 344 F.3d 134, 145 (1st Cir. 2003) (quoting Thomson-CSF, 64 F.3d at 779). But federal courts "have been hesitant to estop a nonsignatory seeking to avoid arbitration." Id. at 145-46.

We have not found any Massachusetts state court case, or any case from our court for that matter, permitting a signatory to

- 21 -

compel a nonsignatory to arbitrate based on intertwined claims estoppel. SDS relies heavily on Machado, but it presented the reverse situation: the Massachusetts Supreme Judicial Court (SJC) applied intertwined claims estoppel to permit the defendant, a nonsignatory to the arbitration agreement at issue, to compel the signatory plaintiffs to arbitrate. See 28 N.E.3d at 409-12. In Machado, the plaintiffs had sued the defendant for claims arising from franchise agreements that they had executed. See id. at 404, 410. The SJC determined that the signatory plaintiffs "[could not] avoid arbitration" with the nonsignatory defendant "when the issues [the nonsignatory defendant] [was] seeking to resolve in arbitration [were] intertwined with the agreements that the plaintiffs [had] signed." Id. at 412.[5]

Similarly, one year earlier in Walker, the Massachusetts Appeals Court highlighted the "significant distinction between forcing a nonsignatory to arbitrate and allowing a nonsignatory to compel a signatory to arbitrate." 9 N.E.3d at 863. As the Walker court reasoned, "the nature of arbitration makes [this distinction] important [because] [a]rbitration is strictly a matter of contract." Id. (alterations in original) (quoting

---

[5] To be sure, Machado involved four signatory plaintiffs and two nonsignatory plaintiffs who were employees of the signatory plaintiffs. See 28 N.E.3d at 404 n.3. But in addressing the application of intertwined claims estoppel, the SJC framed the issue as the "[n]onsignatory compulsion of signator[ies] to arbitrate." Id. at 407.

Thomson-CSF, 64 F.3d at 779). Given "traditional principles of contract and agency law," the court explained, "the cases establishing this form of estoppel limit the use of the form to [compelling] signatories" into arbitration. Id. That makes good sense because a signatory has willingly "entered into [a] written arbitration agreement[]," even if not necessarily with the nonsignatory seeking to compel arbitration. Thomson-CSF, 64 F.3d at 779.

As a federal court sitting in diversity, we decline SDS's invitation to apply intertwined claims estoppel to permit a signatory to compel a nonsignatory to arbitrate when Massachusetts courts have not clearly done so, especially when SDS has failed to provide any persuasive justification for such a holding. See Hanna v. Plumer, 380 U.S. 460, 467 (1965) ("The Erie rule is rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court."). Arbitration is a creature of contract, based on the foundational "tenet that a party cannot be forced to arbitrate if it has not agreed to do so." Hogan, 914 F.3d at 36 (quoting InterGen N.V., 344 F.3d at 137). And although SDS asserts that Abdisalam's claims implicate the Vendor Agreement, it does not explain how they do so in a way that tracks the courts' analyses in Machado and Walker.

### 3. Successor-in-Interest Theory

Finally, SDS relies on a successor-in-interest theory to require Abdisalam to arbitrate his claims. In short, SDS argues that Abdisalam assumed Abdul Courier, LLC's obligations under the Vendor Agreement as its successor in interest. The district court rejected SDS's argument, reasoning that SDS had "offer[ed] no evidence that Abdisalam personally assumed" Abdul Courier, LLC's obligations or acted as the "mere continuation" of Abdul Courier, LLC. We agree that Abdisalam does not qualify as a successor in interest to Abdul Courier, LLC.

"As a general rule, Massachusetts law counsels against imposing the liabilities of a corporation on its successor." Ribadeneira, 65 F.4th at 23. But an exception to the general rule arises when "there is a 'reorganization transforming a single company from one corporate entity into another.'" Id. (quoting Milliken, 887 N.E.2d at 255). In such circumstances, "successor liability may be imposed if 'the entity remains essentially the same, despite a formalistic change of name or of corporate form,' such that the successor entity is a 'mere continuation of its predecessor.'" Id. (quoting Smith v. Kelley, 139 N.E.3d 314, 323 (Mass. 2020)). To determine whether the successor entity is a "mere continuation of its predecessor," "Massachusetts courts examine 'the continuity or discontinuity of the ownership, officers, directors, stockholders, management, personnel, assets,

and operations of the two entities.'" Id. (quoting Kelley, 139 N.E.3d at 323).

Based on our review of Massachusetts law, a successor-in-interest theory does not map onto the undisputed facts of this case. To the extent Massachusetts courts have applied the theory, they have done so primarily when one business entity has reorganized into another to avoid paying its debts. See Milliken, 887 N.E.2d at 254.

Nonetheless, SDS relies on the SJC's holding in Kelley to argue that even an individual like Abdisalam can operate as the mere continuation of a preexisting business entity. Kelley, however, does not help SDS. In Kelley, the SJC imposed successor liability on a sole proprietorship but only because it was "a mere continuation of its predecessor and the purpose of the change [was] to eliminate . . . debt." 139 N.E.3d at 324 (emphasis added). As the SJC reasoned, "the record plainly reflect[ed] that the purpose of dissolving the [former corporation] and establishing the sole proprietorship was to avoid payment of the liabilities at issue." Id. at 326 (emphasis added). Notably, the SJC also repeatedly emphasized "the very unique circumstances of [the] case," which involved an attorney taking advantage of an intellectually disabled veteran, and "caution[ed] that the application of successor liability is fact-specific." Id. at 317, 327.

Here, following its involuntary dissolution at the end of 2023, Abdul Courier, LLC did not reorganize into or continue as another business entity. Rather, Abdul Courier, LLC remained defunct, and no other business entity assumed its obligations under the Vendor Agreement. And there is no suggestion in the record that Abdul Courier, LLC acquired any debt during its existence or that its involuntary dissolution related to any such debt. Although Abdisalam continued to perform deliveries for SDS through October 2024, his performance, without more, does not render him a successor in interest to Abdul Courier, LLC under Massachusetts law.

In urging us to conclude otherwise, SDS points to Ribadeneira, in which we held that one business entity "assumed [another business entity's] obligation to arbitrate under the arbitration clause" at issue. 65 F.4th at 24. But our decision to impose successor liability in that case was based on "[t]he continuity of operations between" two entities. Id. at 23. We did not designate an individual as the successor in interest who thereby assumed the entity's obligation to arbitrate. Although we also compelled an individual -- namely, the owner of the predecessor and successor entities -- to arbitrate, we relied on direct benefits estoppel to do so. See id. at 26-27 (concluding that direct benefits estoppel supported compelling the entities'

owner to arbitrate).  As a result, <u>Ribadeneira</u> does not support SDS either.

Thus, we reject SDS's alternative theories for compelling Abdisalam, a nonsignatory, to arbitrate under the Vendor Agreement.

## IV. CONCLUSION

For all these reasons, we **<u>affirm</u>** the district court's order.